UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

**Marcel Cyr**,
*Plaintiff*

*v.* Docket No. 12-cv-105

**Addison Rutland Supervisory Union**,
*Defendant*

# Plaintiff's Motion for Summary Judgment

## I. Facts

### A. The Cyrs

Marcel Cyr resided in Benson, Vermont with his wife Veronica and their two children Autumn and Edmund from 2005 through the late summer of 2012.[1] The children attended the town's K-8 school, the Benson Village School. Mr. Cyr, a large man,[2] has performed manual labor jobs, including operating heavy machinery, without hearing protection.[3] He consequently suffers hearing loss that makes it difficult for him to follow conversations when he cannot see the person speaking[4] and causes him to speak somewhat loudly.[5]

### B. The Benson School Board and the Cyrs' Political Activity

The Benson Village School is the lone school in the Benson school district, which is governed by a school board of five members elected townwide.[6] The board holds meetings once a month[7] in the school library or gymnasium.[8] Meetings are open to the public,[9] and a portion of each meeting is devoted to public comment.[10] The board permits the public to speak during other

1 Statement of Undisputed Material Fact [UF] # 1.
2 UF # 2.
3 UF # 3.
4 UF # 4.
5 UF # 5.
6 UF # 6.
7 UF # 7.
8 UF # 8.
9 UF # 9.
10 UF # 10.

portions of the meeting, resulting in the public comment on "almost every topic" at meetings.[11]

However, the board limits speech with three unwritten[12] prohibitions. Speakers may not identify a specific student (including their own children)[13] or a staff member.[14] Speakers may not address "specific incidences" involving students or staff either in or out of school.[15] And, speakers may not address "legal matters."[16] The board and the public occasionally violate these prohibitions.[17]

The Benson school district is a part of the defendant Addison Rutland Supervisory Union,[18] which comprises a total of five elementary schools and one high school. Addison Rutland Supervisory Union superintendent Ron Ryan and Benson Village School principal Kim Doty attend every Benson school board meeting.[19] Ryan, Doty, and all board members believe that public attendance and participation help the community to keep apprised of the goings-on at the school, and give officials the opportunity to hear concerns directly from voters.[20]

While living in Benson, the Cyrs often attended school board meetings. Mr. Cyr even ran, unsuccessfully, for election to the board.[21] On occasion, members of the public, including Mr. Cyr, addressed one of the three prohibited topics while speaking at school board meetings. Some officials considered such speech to be a disruption.[22] That hyperbole aside,[23] Mr. Cyr's

---

11 UF # 11.
12 UF # 12.
13 UF # 13.
14 UF # 14.
15 UF # 15.
16 UF # 16.
17 UF # 17.
18 *See* Def.'s Mot. to Quash 2 (Nov. 28, 2012) [ECF # 15] (arguing that plaintiff could not subpoena district records because "the use of a subpoena against [a] party is generally disfavored").
19 UF # 18.
20 UF # 19.
21 UF # 20.
22 UF # 21.
23 Neither Mr. Cyr nor any other speaker disrupted meetings by violating the speech prohibitions. *E.g., Norse v. City of Santa Cruz*, 629 F.3d 966, 976 (9th Cir. 2010) (city council may not eject attendees who violate "rules of decorum" but do not cause objective disruption of meeting).

behavior at meetings was unremarkable.[24] He never caused an actual disruption,[25] threatened the board,[26] argued with another member of the public,[27] or engaged in any behavior that necessitated summoning the police.[28]

The Cyrs sometimes placed signs outside of school board meetings. On one occasion one of their signs was knocked over during a meeting, so the pair occasionally sat in their parked car nearby to ensure that no one stole or knocked down their signs during the board meeting.[29] The Cyrs also displayed signs on their family car proclaiming opinions about school policy.[30] Their signs were a success inasmuch as at least one board member and superintendent Ryan learned of the Cyrs' views from the signs.[31] Under the name "Parents for Positive Change," the Cyrs also printed flyers advocating their views, and Marcel handed them out at the local grocery store.[32]

**C. Disagreements Over Edmund Cyr's Education**

During his time in Benson, Edmund Cyr was diagnosed with autism spectrum disorder.[33] The school provided Edmund with special services under the supervision of Kristin Benway, Defendant's director of special education. The Cyrs met frequently with Edmund's educators. Meetings were sometimes cordial[34] and sometimes contentious. The Cyrs and staff often had different views of Edmund's progress, and developed communication difficulties.[35] When the Cyrs believed staff was ignoring their concerns, they[36] would send the same message via letter, email, and telephone call,[37] and request that copies be placed in Edmund's file. Occasionally,

24 UF # 22.
25 UF # 23.
26 UF # 24.
27 UF # 25.
28 UF # 26.
29 UF # 27.
30 UF # 28.
31 UF # 29.
32 UF # 30.
33 UF # 31.
34 UF # 32.
35 UF # 33.
36 Veronica and Marcel Cyr share an email account and signed letters jointly. UF # 34.
37 UF # 35.

Mr. Cyr hand-delivered letters to the school.[38]

For her part, Kristin Benway believed Marcel interpreted information in a literal way that rendered ambiguity difficult to process.[39] She perceived him to be agitated during some meetings,[40] "barraging [staff] with multiple questions at one time."[41] She thought that some staff found his speech volume and demeanor to be intimidating, especially given his size.[42] Benway found that having Doty attend meetings by telephone reduced tensions.[43]

The Cyrs' insistent inquiries and criticisms made Doty and her staff feel "very threatened about their professional integrity and their expertise."[44] Doty concedes that such umbrage was not the same as feeling physically threatened.[45] Doty also ascribed some of Edmund's behaviors to Marcel's ill-will. When Edmund's therapist reported that the boy had mentioned that he wanted to "come after" Doty "with an axe," Doty assumed the words to be those of Edmund's father rather than the exaggerated language of a schoolboy.[46]

Suspicion of Mr. Cyr spilled outside of school. A teacher reported seeing Mr. Cyr drive by her house; in reality, the Cyrs' longtime friend lives on the same road as the teacher, near where they shop.[47] A staff member was concerned that the Cyrs—watching to make sure that their signs were not disrupted— had parked near school property during a board meeting.[48] A board member, who lives in the center of Benson, witnessed Mr. Cyr driving past with signs on his car, honking the car horn.[49] A staff member reported that Marcel displayed his middle finger

38 UF # 36.
39 UF # 37.
40 UF # 38.
41 UF # 39.
42 UF # 40.
43 UF # 41.
44 UF # 42.
45 UF # 43.
46 UF # 44.
47 UF # 45.
48 UF # 46.
49 UF # 47.

to her on a public road on a summer day,[50] although Mr. Cyr admits that he has a habit of "flipping . . . the bird" when the driving of other motorists bothers him.[51] Finally, a supervisory union board member testified that Marcel said something "very derogatory . . . and I thought threatening" about Ron Ryan while telling the board member that he thought Ryan should be fired, but does not remember what.[52] Ryan was "not terribly surprised" at the comment.[53]

Suspicions notwithstanding, Mr. Cyr never threatened staff at any meeting[54] or when delivering correspondence to school,[55] and he never swore at staff.[56] Notably, despite her disagreements with them and professed distaste for their messages, Doty never asked the Cyrs to reduce the frequency or change the tone of their communications with staff.[57]

Mr. Cyr's relatively tame demeanor contrasts with the conduct of some other parents during Doty's tenure: two parents fought in the school parking lot;[58] an enraged parent menaced a pregnant teacher, who barricaded herself in the nurse's office until police arrived;[59] a father "barged in" to Doty's office after school, "screaming at [her], swearing at [her] . . . in [her] face with his finger"[60]; and two parents accused each other of having threatened the other's child.[61] None of these parents, perceived to be menacing, were barred from school property.[62] Doty sent the parent who menaced the pregnant teacher a letter requesting that she change her behavior.[63] Doty repaired the relationship with the enraged father by talking with him about the incident.[64]

And, the Cyrs were not the only parents expressing discontent with the job performance

50 UF # 48.
51 UF # 49.
52 UF # 50.
53 UF # 51.
54 UF # 52.
55 UF # 53.
56 UF # 54.
57 UF # 55.
58 UF # 56.
59 UF # 57.
60 UF # 58.
61 UF # 59.
62 UF # 60.
63 UF # 61.
64 UF # 62.

of staff. Doty has received "thousands" of letters from parents about "[t]hings [staff] weren't doing; things we were doing wrong."[65] Doty found those letters to be "professionally threatening" as she did the Cyrs'.[66]

### D. The September 2011 No Trespass Order

Matters between Doty and Mr. Cyr took a turn for the worse one sunny afternoon shortly before the start of the 2011-2012 school year, when the Cyrs were preparing for a camping trip. They had communicated with Doty during the day, hoping to arrange for Edmund to visit his classroom before the year began, to reduce his anxiety. Unable to arrange a time,[67] they decided simply to drive by the school on their way out of town so as to re-acquaint Edmund with the school.[68] Mr. Cyr looped the family car through the school's circular drive, honked the car's horn once, and the entire family waved.[69] The Cyrs went on their way without stopping.[70] Doty was in her office with a colleague, and did not see the car until her colleague told her to look out the window as it drove away.[71] Improbably, Doty "clearly received" that the "message" of the family's drive-by wave was "you lied to us or whatever it was but I should have been able to see that classroom, beep, beep, Ms. Doty, we know you're in the building."[72] Doty did not call the police,[73] but decided that the Cyrs' visit was "the straw that broke the camel's back." She requested superintendent Ryan's permission to issue Mr. Cyr a notice against trespass (NAT).[74]

Ryan's permission to issue the NAT was all that was required.[75] Defendant has no

65 UF # 63.
66 UF # 64.
67 UF # 65.
68 UF # 66.
69 UF # 67.
70 UF # 68.
71 UF # 69.
72 UF # 70.
73 UF # 71.
74 UF # 72. A "no trespass order" or "notice against trespass" is just actual notice that a person is not welcome on a piece of property, for purposes of establishing eligibility for prosecution should s/he enter the property in the future. *See State v. Dixon*, 725 A.2d 920, 922 (Vt. 1999) (enumerating elements of unlawful trespass offense).
75 UF ## 73, 74.

policies or procedures governing use or breadth of NATs.[76] Defendant has never trained Doty or Ryan about NATs.[77] Doty is unaware that NATs can be issued for lengths of time longer or shorter than two years.[78] Doty believes that an issuer of a NAT has no obligation to tell the recipient why it has been issued.[79]

In speaking to Ryan, Doty embellished her account of the brief family visit, telling him that "she had been there late a few nights and [Marcel] had driven by her window and he was the only car in the parking lot and she . . . felt that, you know, her life was possibly in danger from this guy."[80] Ryan did not investigate Doty's allegations, but gave her permission to issue the NAT.[81] Doty informed the school board of the NAT after the fact by telephoning chair Mike Ellis and telling him that Marcel "would on a daily basis drive up beside the office" honking his car horn and giving "the finger" to teachers.[82]

Doty contacted the Fair Haven Police Department,[83] and filled out a blank form that it makes available for NATs.[84] Doty did not ask the police to investigate Mr. Cyr.[85] Nothing Doty told Police Chief William Humphries suggested any criminality.[86] Chief Humphries expressly advised Doty that an NAT did not preclude Mr. Cyr from telephoning or emailing her or school staff.[87] On September 6, 2011, Mr. Cyr was served with the NAT barring him from "all building, property & parking lot owned by school [sic]."[88] Cyr was given no reason for the issuance of the NAT nor was he told how to contest it.[89]

76 UF # 75.
77 UF # 76.
78 UF # 77.
79 UF # 78.
80 UF # 79.
81 UF # 80.
82 UF # 81.
83 At the times relevant to this suit, Benson contracted with the town of Fair Haven for police services. William Humphries deposition [Ex. 16] 17:1-18.
84 UF # 82.
85 UF # 83.
86 UF # 84.
87 UF # 85.
88 UF # 86.
89 UF # 87.

When the school board met a week later, Marcel obviously could not attend,[90] but Mrs. Cyr did. When she rose and asked why her husband had been banned, Doty shrugged and said that "we don't need a reason."[91] Another member of the public asked if Marcel was a danger to the school, and Ryan responded that "if there was a threat to the student population you would be notified."[92] No such notification about Mr. Cyr has ever been issued.[93]

As mercurially as it was issued, the September 2011 NAT was withdrawn by Doty three weeks later[94] when she decided that it was in Edmund's interests for staff to have a working relationship with the Cyrs.[95] After lifting the NAT, Doty did not ask Mr. Cyr to change any of his behaviors or methods of communicating with staff.[96]

**E. The March 2012 NAT**

Acrimony arose again in March 2012, when the Cyrs and the defendant were arranging an evaluation of Edmund for the coming 2012-2013 school year.[97] Psychologist Nancy Cotton was picked as the evaluator. Cotton spent March 15th at the school meeting with staff, who provided her with some of Mr. Cyr's correspondence, and staff notes of meetings.[98] Staff also told her of their difficulties with Cyr, and how they found him intimidating. One staff member re-told the account of Marcel driving by her house;[99] another told Cotton about a Parents for Positive Change flyer, recounting that it was "printed with the individual . . . name of a teacher" who was criticized.[100] Cotton never laid eyes on the flyer,[101]which does not name any teacher.[102]

90 UF # 88.
91 UF # 89.
92 UF # 90.
93 UF # 91.
94 UF # 92.
95 UF # 93.
96 UF # 94.
97 UF # 95.
98 UF # 96.
99 UF # 97.
100 UF # 98.
101 UF # 99.
102 UF # 100.

Given inaccurate information, Cotton considered the flyer to constitute "[p]ersonalized attacks" on staff.[103] Doty regaled Cotton with her yarn about the Cyrs' drive-by, *i.e.*, she was in the "darkened school, no one else there except her, working in her office . . . with a light on, and a truck going back and forth honking, and she looked out and it was Mr. Cyr."[104]

Based entirely on these reports, and though she had never even met Marcel,[105] Cotton thought she was obligated under state law to warn the school that Mr. Cyr might pose a danger to it.[106] She met with Doty and Benway at the close of her visit, telling them that "they had a potential for violence in their school," and recommended they "request . . . an independent mental health assessment of Mr. Cyr's mental status."[107] Cotton told them that "she was speaking . . . as a clinical psychologist," because she considers every conclusion reached while "working in a professional capacity" to be a "clinical opinion."[108] It did not matter to her whether the information given to her about Mr. Cyr was accurate, because she simply wished to fulfill her supposed duty to warn.[109] She made no attempt to verify any of it.[110] She voiced no opinion as to whether Cyr actually posed a threat of violence, because she had not conducted an assessment of him.[111] The three left the meeting without plans to take any steps about Mr. Cyr,[112] although Doty notified Ryan of the warning.[113]

A week later, Kris Benway telephoned Cotton about a comment that had been posted in

103 UF # 101.
104 UF # 102.
105 UF # 103.
106 UF # 104.
107 UF # 105.
108 UF # 106.
109 UF # 107. She got it wrong, of course. *See Peck v. Counseling Serv. of Addison County, Inc.*, 499 A.2d 422, 425 (Vt. 1985) (holding that the relationship between patient and therapist creates a duty to protect potential victim of patient's conduct). She has never laid eyes on Mr. Cyr, let alone formed the requisite "special relationship . . . which gives [her] a definite control over the actions of [him]." *Id.* at 425. She is no more liable for Mr. Cyr's actions as she is for any stranger on the street. *See Barrett v. Prison Health Servs., Inc.*, No. 08-cv-203, 2010 WL 2837010, at *6 (D. Vt. July 19, 2010) (to trigger the duty, "[a] 'special relationship' must be based upon the actual interaction between the alleged mental health professional and the alleged patient.").
110 UF # 108.
111 UF # 109.
112 UF # 110.
113 UF # 111.

response to a story on WCAX-TV's website, reporting that the defendant's teachers had filed an unfair labor practice complaint.[114] Benway told Cotton that Mr. Cyr wrote the comment, because the author was identified as "Parents for Positive Change."[115] It read:

> When dealing with snakes, you must expect them to twist and turn in an attempt to bite you, any way they can. The teachers will do anything to force there will on the taxpayer. Up to and including taking it out on the Kids. the best way to deal with a snake is to remove the head. "If they Strike fire them".[116]

Benway had not investigated whether Mr. Cyr had written the comment.[117] Had she, she would have learned that Veronica Cyr wrote the comment.[118]

Cotton thought the comment represented a "dehumanization of people," which she opined was a risk factor for violence.[119] After the telephone call with Benway, Cotton testified that staff asked her to write down her warning,[120] "to be sure that it was clear that it came from [Cotton], that it was [Cotton's] suggestion," *i.e.*, that "they weren't doing this before [she] came."[121]

On March 23, 2012, Cotton wrote and faxed the requested letter to Ron Ryan. Cotton wrote that staff's accounts of Marcel caused her to suspect that "there was potential risk of violence to them,"[122] and quoted Veronica's snake allegory. "In my clinical opinion," Cotton concluded, "this is a serious threat in the context of dehumanizing people by comparing them to animals."[123] Ryan had already heard the allegations in the letter before, including the "snakes" comment.[124] He neither called 911[125] nor activated the defendant's emergency warning system.[126] Ryan did not contact Cotton to discuss her letter.[127] Ryan did no investigation of the allegations

114 UF # 112.
115 UF # 113.
116 UF # 114.
117 UF # 115.
118 UF # 116.
119 UF # 117.
120 UF # 118.
121 UF # 119.
122 UF # 120.
123 UF # 120.
124 UF # 121.
125 UF # 122.
126 UF # 91.
127 UF # 123.

other than to talk with Benway and Doty.[128] Once again, Ryan decided to issue Mr. Cyr a NAT.

Although Ryan received Cotton's fax on a Friday, March 24th, he did not issue the NAT until the following Monday, March 26th. That Monday – eleven days after Cotton's verbal warning – Ryan contacted Chief Humphries to obtain another NAT.[129] Ryan did not report a possible crime or ask Humphries to investigate Mr. Cyr.[130] Ryan filled out and signed a form NAT,[131] barring Mr. Cyr from all of Defendant's property for two years, without any explanation of reasons or of how to contest the NAT.[132]

Ryan does not know of any impermissible reasons for a NAT,[133] whether an explanation is required,[134] or how a recipient may contest one.[135] Ryan barred Mr. Cyr from all property in the supervisory union even though Marcel had never appeared at any school other than Benson,[136] and his behavior at supervisory union headquarters "was fine."[137] Ryan never considered restricting the March 2012 NAT to classrooms and offices rather than all property in the union.[138] He issued the NAT for two years simply because the two year term was pre-printed on the bottom of the form that he chose to use.[139]

**F. Mr. Cyr's Attempts to Obtain Due Process**

A day after being banned, Marcel emailed the defendant to inquire as to the reason for the NAT. Its lawyer replied only that the NAT issued because the union "was in receipt of written information submitted under a professionals' [sic] duty to warn."[140] Defendant suggested that it

128 UF # 124.
129 UF # 125.
130 UF # 126.
131 UF # 127.
132 UF # 128.
133 UF # 129.
134 UF # 130.
135 UF # 131.
136 UF # 132.
137 UF # 133.
138 UF # 134.
139 UF # 135.
140 UF # 136.

might reconsider the ban if Mr. Cyr underwent a mental health risk assessment, but did not explain what such an assessment entails or whether the results would be kept confidential.[141] Befuddled, Cyr filed a public records request for documents showing the reasons for the ban.[142]

Veronica Cyr brought her daughter Autumn to the next school board meeting, held on April 10th.[143] Unbeknownst to them, Ryan and board chair Mike Ellis had agreed beforehand to stop anyone from trying "to plead [Marcel's] case."[144] When Autumn rose to read a letter about the NAT, Ellis told her that she was not permitted to speak about the subject, on account of the board's "legal matter" prohibition.[145] Ryan had a police officer attend the meeting in case Marcel showed,[146] but Marcel has perfectly obeyed both NATs.[147]

Two days after the meeting, the supervisory union sued Mr. Cyr in the Vermont Superior Court, asking the court to declare that it need not comply with his public records request.[148] Mr. Cyr filed suit in this Court for the violation of his First and Fourteenth Amendment rights [ECF # 1]. In the state court, Mr. Cyr counterclaimed and moved to dismiss the claim against him.

Later in April, Marcel asked the defendant to move board meetings to a location where he would not risk arrest for attending. The defendant advised Mr. Cyr that that he could attend by telephone.[149] It made clear, though, that if Mr. Cyr did so, the board would not discuss the NAT.[150] Based upon his hearing deficiency, the poor acoustics of the school library and gym, and his concern that he was being excluded from the community, Mr. Cyr declined.[151]

In November 2012, the superior court granted Mr. Cyr's motion to dismiss. Rather than

141 UF # 137.
142 UF # 138.
143 UF # 139.
144 UF # 140.
145 UF # 141.
146 UF # 142.
147 UF # 143.
148 UF # 144.
149 UF # 145.
150 UF # 146.
151 UF # 147.

defend against his open records counterclaim, the supervisory union produced the Cotton letter seven months after banning Mr. Cyr.[152] Mr. Cyr amended his federal complaint [ECF # 22], and the Court denied the resulting motion to dismiss [ECF # 25], except as to Mr. Cyr's procedural due process protections for being present on school grounds other than while attending public meetings [ECF # 33]. Mr. Cyr now moves for summary judgment, which the Court may grant if there is no dispute of material fact and he is entitled to judgment as a matter of law. *E.g., Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 843 (2d Cir. 2013).

## III. The NATs Violated Mr. Cyr's First Amendment Right to Receive Information

In Count 1 of his amended complaint, Mr. Cyr alleges that the NATs violated his First Amendment right to receive information. The First Amendment "goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First N'tl Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978). This "freedom to listen" guarantee is a "right to receive information or ideas." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980) (internal quotation omitted). The guarantee provides a right of access to a range of government proceedings from criminal trials, *id.* at 580, to administrative agency hearings, *New York Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 303 (2d Cir. 2011), to municipal government meetings. *Whiteland Woods, L.P. v. Township of West Whiteland*, 193 F.3d 177, 180 (3d Cir. 1999).

The determination of whether the First Amendment right of access attaches to a government proceeding "cannot be resolved solely on the label we give the event," *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 7 (1986) ("Press-Enterprise II"). Rather, it turns on the application of "two helpful principles," *Richmond Newspapers*, 448 U.S at 589 (Brennan, J., concurring), known as the "experience and logic test." *NYCLU*, 684 F.3d at 297. First, a court

152 UF # 148.

must consider whether experience has shown the proceeding in question to "have historically been open to the press and general public." *Press-Enterprise II*, 478 U.S. at 8 (internal quotation omitted). Next, a court considers the logic of whether "public access plays a significantly positive role in the function of the particular process in question." *Id.* If both of those inquiries are answered affirmatively, "a qualified right of public access attaches" to the proceeding, and any restriction upon the right is subjected to strict scrutiny. *Id.* at 9, 13-14.

**A. "Experience and Logic" Demonstrate that Public Access Plays a Significantly Positive Role in the Function of Municipal Government Meetings That Have Long Been Open to the Public**

In order to determine whether a proceeding has historically been open, our Circuit looks to "the length of a tradition by reference to the kind of institution and proceeding" at issue. *NYCLU*, 684 F.3d at 302 n.11. The "type or kind" of proceeding here is a municipal government meeting. *El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147, 151 (1993).

Vermont's experience demonstrates that the state's citizens have placed a premium on access to local government meetings since the early days of statehood. A 1797 statute, for example, granted school districts the power "to raise money by a rate or tax . . . as they shall think most proper, for the purpose of . . . supporting schools in such district," but required that the power be exercised at a warned, public meeting. Laws of Vt. ch. 54, § 3 (1797). A later statute permitted three or more voters to require a school board convene a meeting, and subjected board members to fines for failing to do so. Vt. Rev. Stat. tit. 9, ch. 18, § 26 (1840). Forty years ago, the Legislature codified a default right of access to local government meetings. 1973 Vt. Acts & Resolves 218-221, *codified at* Vt. Stat. Ann. tit. 1, §§ 315-320. Hence, there can be little doubt that municipal government meetings like the ones at issue here have historically been open to the public and press.

Next, the 'logic' inquiry of *Press-Enterprise II* "asks whether openness enhances the

ability of the government proceeding to work properly and fulfill its function." *NYCLU*, 684 F.3d at 302. At their meetings, Vermont school boards weigh questions such as the appropriate expenditures of public money, the hiring and firing of staff, and the adoption of policy shaping the operation of the schools. State law aside, school boards could take such decisions in a vacuum, and only get feedback from the public once a year during annual local elections. But even the defendant's officials agree that the decision-making process is improved by having the public at the meetings to provide feedback and information that board members might not otherwise know. Conversely, the public benefits from attending the meetings and hearing news of the school's business in person, rather than secondhand in town – thus fostering a better understanding, and less cynicism of, school governance. In short, the municipal government meetings at issue here are "precisely the type of public proceeding to which the First Amendment guarantees a public right of access." *Whiteland Woods*, 193 F.3d at 181.

**B. The Exclusion of Mr. Cyr from School Board Meetings Fails Strict Scrutiny Review**

When a First Amendment right of access attaches to a governmental proceeding, the proceeding may not be closed unless "closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise II*, 478 U.S. at 13-14. Defendant's closure of municipal government meetings to Mr. Cyr was neither essential nor narrowly tailored, and therefore violated his First Amendment right to receive information.

**i. The Defendant's Reaction to the Allegations Against Mr. Cyr Demonstrate that He Did Not Pose a Substantial Probability of Harm**

Closure can only be deemed "essential" if the government demonstrates (1) that there is a substantial probability that its asserted interest will be prejudiced by permitting normal access to the proceeding, *ABC, Inc. v. Stewart*, 360 F.3d 90, 101 (2d Cir. 2004); *United States v. Doe*, 63 F.3d 121, 129-130 (2d Cir. 1995), and (2) that "reasonable alternatives to closure cannot

adequately protect" the asserted interest. *Press-Enterprise II*, 478 U.S. at 14. The substantial probability requirement means that a government entity may not close a proceeding that the public has a First Amendment right to attend based on speculation, or even a hunch, that something bad will occur. A "reasonable likelihood" of harm to the government's interest will not support closure, *id.*, and a *possibility* of harm to a government interest falls far short of creating "the rare circumstances" in which closure of a proceeding is permitted by the First Amendment. *Vidal v. Williams*, 31 F.3d 67, 69 (2d Cir. 1994). Here, the record demonstrates that no substantial probability of harm existed to support barring Mr. Cyr from public meetings, even assuming that defendant's interest was in the physical safety of its staff. *See Doe*, 63 F.3d at 127.

In September 2011, Defendant shut Mr. Cyr out of public meetings on the basis of a collection of allegations occurring both on and off school property, including a bizarre one in which the Cyr family honked and waved at the school from their car on a sunny day. The defendant itself acknowledged that it did not really believe the allegations to suggest a substantial probability of harm to staff. It did so firstly when its superintendent assured the public that it would have been warned had Mr. Cyr been a danger and no warning was issued. And principal Kim Doty tacitly confirmed the non-urgency of the situation in the way that she spiced up the story of the Cyrs' drive-by waving to Ryan, Ellis, and Cotton. In each, the Cyrs' visit was transformed into Marcel cruising the parking lot menacingly at night when Doty was in the building alone, or coming to school and giving "the bird" to children. Doty embellished the story because what actually happened did not present a credible threat to anyone.

The final proof of the September 2011 closure's infirmity comes in its lifting three weeks after issuance. Defendant lifted the NAT without asking Mr. Cyr to change his behavior in any manner, and without telling him what behavior it found objectionable. In a number of incidents in which other parents presented truly threatening behavior, by contrast, Defendant made contact

with the parent and made clear that the behavior was unacceptable. Its failure to ask Mr. Cyr to correct his behavior underscores that while Defendant found Mr. Cyr infuriating, or even intimidating, it did not find him to be a person posing the substantial probability of violence.

The March 2012 NAT fares no better. Defendant received Cotton's verbal caution about Mr. Cyr on the fifteenth of the March, but did nothing with it – no 911 calls, no emergency warnings, no increased security at school – until March 26th, *eleven days* later. When Defendant did take action, it issued Mr. Cyr a notice against trespass, a measure that the local police use against shoplifters, and one that Kristin Benway knows is "about as good as the paper they're written on."[153] Before issuing the NAT, Defendant took the time to get Cotton's tip in writing, to ensure that the idea of excluding Mr. Cyr looked as if it had come from her rather than staff. These were not the actions of an entity that understood itself to be facing a substantial probability of peril. *Cf. Phoenix Newspapers, Inc. v. U.S. District Court*, 156 F.3d 940, 950 (9th Cir. 1998) (no substantial probability of harm where telephone threats to jurors were not followed with measures designed to protect their physical security, such as police escorts or sequestration). Defendant's lack of urgency at the March allegations stemmed from its familiarity with them. The only new allegation that not recycled from the September 2011 NAT was Veronica's snake allegory. Leaving aside Defendant's eagerness to attribute the allegory to the wrong Cyr, no rational observer could take the comment as a true threat. Or, at least, no observer who has ever seen the Gadsden Flag or the first American political cartoon, Ben Franklin's *Join, or Die*, a 1754 woodcut depicting the colonies as segments of a cut-up snake.

Of course, Cotton's letter does not create a constitutional shortcut just because it came from a psychologist. Dr. Cotton's motivation in drafting the letter was not achieving factual accuracy, but discharging a duty to warn she believed herself to bear based on inaccurate

153 Kristin Benway deposition [Ex. 7] 135:19-24.

accounts and a misunderstanding of the law. Defendant knew Cotton was not Mr. Cyr's therapist, and that her observations were based on hearsay from staff members, as she herself said. If a suspicion of a mental health professional constituted *per se* proof of a substantial risk of violence, then government agencies could bar someone from public meetings based solely upon a psychologist's opinion of a rude bumper stickers or other protected "uncivil discourse."[154]

**ii. The Defendant Failed to Account for the Reasonable Alternatives of Barring Mr. Cyr from School Classrooms and Offices at Times When Public Meetings Were Not Being Held, or Hiring a Police Officer**

The second element of an "essential" closure is the absence of reasonable alternatives to closure that adequately protect the government's interest in shutting off access to the proceeding. *Press-Enterprise II*, 478 U.S. at 14. In this dispute, Defendant failed to consider, or implement, reasonable alternatives to maintain the physical safety of its staff. The most obvious alternative to complete closure of public meetings was an order forbidding Mr. Cyr from visiting school offices or classrooms outside of the times that public meetings were held, since his behavior at school board meetings was unexceptional. Another alternative to closing meetings to Mr. Cyr was the presence of a police officer at school board meetings. Although Mr. Cyr had not once behaved in a way that required the police to be summoned, Defendant evidently considered a police officer's presence to be a sufficient safeguard at the April 2012 school board meeting, when it had one attend in case Mr. Cyr violated the NAT. Either option would have appropriately reserved the strong prohibition of closing off all public Board meetings to Mr. Cyr. Defendant's instant leaps total exclusion violated Mr. Cyr's right to receive information.

**iii. There Was "No Tailoring at All" of the NAT's Issued to Mr. Cyr**

Lastly, the two NATs violated the First Amendment for their lack of tailoring.

---

154 "I don't think that uncivil discourse . . . is ever justified in civil society." Nancy Cotton deposition [Ex. 14] 78:14-17.

Both orders were issued for a duration of two years simply because that was the length of time printed on the Fair Haven police forms used by Defendant. Although the September 2011 order was issued for two years, it was lifted within three weeks, demonstrating again the underlying absence of basis for its stated duration. The March 2012 order, meanwhile, lasts for two years, and the defendant's superintendent has no firm plans to renew the order when it expires: "once it expires, it expires."[155] The March order's geographical reach is similarly capricious. Ryan issued the order to encompass the entire supervisory union based upon a concern that Mr. Cyr would appear at other schools or Defendant's headquarters, but admitted that Mr. Cyr's behavior at headquarters had been "fine," and that Mr. Cyr had never shown up at another school.

The Second Circuit has condemned an NAT narrower than the ones at issue here. In *Huminski v. Corsones*, the NAT barred the recipient from courthouse grounds except for times when he was attending a hearing on an action to which he was a party. 396 F.3d 53, 88 (2d Cir. 2005). Mr. Cyr, by comparison, was barred from Defendant's property regardless of whether he had business there, including any board meeting at which he might contest the NATs. The broad NAT here is squarely within *Huminski*'s prohibition of a "First-Amendment-Free Zone" with "virtually no tailoring at all" that was actually more permissive than the NAT's that Mr. Cyr challenges here. *Id.* at 87, 92. Mr. Cyr is entitled to judgment on his First Amendment access to information claims.

## IV. The NATs Violated Mr. Cyr's Right to Free Speech

The two NAT's also violated Mr. Cyr's First Amendment right of free speech. Because each NAT was issued to Mr. Cyr alone, and had the effect of forbidding him from speaking on supervisory union property, each is the equivalent of an injunction for free speech purposes. *Huminski*, 396 F.3d at 92. Injunctions against speech raise significant concerns, as they pose a

155 Ron Ryan deposition [Ex. 2] 85:23-86:6.

much more serious risk of censorship than generally applicable statutes or ordinances do. *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 764 (1994). For that reason, injunctions against speech are impermissible unless restricting "no more speech than necessary to serve a significant government interest." *Id.* at 765.

The NAT's at issue here violate *Madsen* because they suppressed far more of Mr. Cyr's speech than necessary to protect staff from what they imagined to be his intimidating behavior. The orders completely forbade him from attending or participating in school board meetings, where his behavior had been unremarkable even during times when he was at loggerheads with staff. And the orders effectively forbade him from placing signs outside of school board meetings, or parking his sign-bearing car on school property, where board and staff members had seen his messages and relayed them to others. The orders cut off his expression before the Board for two years, for reason other than that duration printed on the bottom of the form. Most strikingly, Defendant traded Mr. Cyr's public meeting speech rights for a set of restrictions that left him free to act in the worst ways imagined by staff. He was and is free to send as many critical letters or emails to staff as he pleases, to place telephone calls to them, drive by their houses, flash his middle finger to them on public roads, post critical comments about them to websites, or to leaflet in front of the grocery store to his heart's content. But he is not free to raise his objections in the public forum designed for them.

Of course, Defendant's offer to permit Mr. Cyr to attend meetings by telephone or other technological substitute is just as impermissible a diminution. Mr. Cyr's hearing loss makes it very difficult for him to follow conversations without seeing the person speaking, and the meetings take place either in the library, where the surroundings muffle speakers' voices, or the gymnasium, where the room's large size practically necessitates shouting. Even leaving Mr. Cyr's condition aside, relegation to remote participation removes his ability to speak directly to

his representatives, see their reaction to his speech, and tailor his remarks accordingly. *See Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972) (contrasting electronic communication with the superior qualities of "face-to-face debate, discussion and questioning."). Anyone who has ever witnessed an attempt to participate in a meeting with a room full of people via speakerphone will instantly recognize Defendant's suggestion as nothing more than a free speech penalty box.

## V. The NTAs' Issuance Without Notice or Meaningful Opportunity to be Heard Violated Mr. Cyr's Fourteenth Amendment Right to Procedural Due Process

In Count 2 of his amended complaint, Mr. Cyr alleges that the defendant stripped him of his First Amendment rights without due process when it issued him the NATs. Section one of the Fourteenth Amendment guarantees that no state or municipality may deprive a person "of liberty . . . without due process of law," and First Amendment freedoms are liberty interests protected by procedural due process. *Procunier v. Martinez*, 416 U.S. 396, 417 (1974); *Sherrill v. Knight*, 569 F.2d 124, 131 (D.C. Cir. 1977). The measure of the process due is taken by weighing the private interest at stake versus the government's interest, as well as "the risk of an erroneous deprivation" that a procedure entails against the costs and value "of additional or substitute procedural safeguards." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). A procedural due process claim does not depend on the validity of the deprivation, but on whether the plaintiff "received the process he was due." *Kuck v. Danaher*, 600 F.3d 159, 165 (2d Cir. 2010).

In this litigation, Mr. Cyr's private interest lies in his First Amendment rights to receive information and express himself. The loss of any First Amendment right, "even for minimal periods of time, unquestionably constitutes irreparable injury." *New York Progress & Protection PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (internal quotations omitted). Assuming that Defendant's interest is in preserving the safety of its staff, the parties' interests are equally balanced for procedural due process purposes. *See Sherrill*, 569 F.2d at 130 (agreeing that government's interest in protection of the president is "overwhelming," but holding it insufficient

to permit arbitrary denial of White House press passes). However, the final *Mathews* element, the challenged procedure's risk of erroneous deprivation and the burden of additional safeguards, reveals three dispositive deficiencies in what Mr. Cyr underwent. Any of them suffices for judgment to enter in Mr. Cyr's favor on Count 2 of his complaint.

**A. The Defendant Provided No Information to Mr. Cyr about Either NAT**

The first deficiency lies in the complete absence of notice that attended either NAT. Notice must be "reasonably calculated, under all the circumstances" to apprise the deprived person of the deprivation, *Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 224 (2d Cir. 2012) (internal quotation omitted), must include "specific facts underlying the allegation[s]" leading to the government's action, *Taylor v. Rodriguez*, 238 F.3d 188, 193 (2d Cir. 2001), and must inform the deprived person about the means for contesting the deprivation. *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14-15 (1978).

The NATs served upon Mr. Cyr met none of these requirements. Both contained a hand-written annotation of the property from which Mr. Cyr was banned, but said nothing about why he had been banned. Defendant provided no explanation to Mr. Cyr about the September NAT, and only a passive-voice hint about the March one, *i.e.*, that it "was in receipt of written information . . . regarding an unacceptable risk regarding Mr. Cyr's presence." Doubling down on the constitutional violations, Defendant sued Mr. Cyr in April 2012 to prevent him from obtaining the reasons for the NAT.

Neither NAT provided Mr. Cyr with information about how to contest the deprivation. The September 2011 NAT came and went without any mention of Mr. Cyr's ability to contest it, and the March 2012 had none until Mr. Cyr inquired. Defendant suggested in response that it "would be willing to reconsider" the March NAT if he underwent a mental health risk assessment, but did not explain what other criteria would go into its reconsideration, or what a

mental health risk assessment is.

Of course, constitutionally sufficient notice would not have entailed any additional expense or administrative burden to the defendant. If it were concerned about releasing the allegations verbatim, it could have summarized the allegations without revealing, for example, which person accused him of which behavior. Even prisoners must be accorded such basic fairness. *E.g., Taylor*, 238 F.3d at 193-194. Defendant's failure to provide *any* timely information as to the reasons for the NAT's violated the Fourteenth Amendment.

**B. Mr. Cyr Was Offered No Opportunity to Contest the NATs**

Secondly, Defendant provided no meaningful opportunity for Mr. Cyr to contest the removal of his First Amendment rights. Regardless of whether the opportunity was required before or after the deprivation, *compare Board of Regents v. Roth*, 408 U.S. 564, 569-579 (1972) ("When protected interests are implicated, the right to some kind of prior hearing is paramount.") *with Brody v. Vill. of Port Chester*, 434 F.3d 121, 134 (2d Cir. 2005) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands.") (internal quotation omitted), Mr. Cyr was offer*ed nothing* and, upon examination, the original factual basis is inarguably wanting. In September 2011, Defendant offered Mr. Cyr no opportunity to be heard. In March 2012, Defendant suggested that the only way to contest the ban on public meeting attendance was for Mr. Cyr to undergo a mental health risk assessment. But a mental health evaluation would not provide a forum for Mr. Cyr to rebut the rumors about him and his political activity repeated by staff to Dr. Cotton, as it does not involve the presentation of testimony and weighing of facts. Moreover, the personal invasion of privacy too high for it to be taken seriously as a meaningful opportunity to be heard. The evaluation would probe Mr. Cyr's mental health. Defendant never provided any assurance that any result would be kept confidential, so it is unsurprising that Mr. Cyr refused to invite the government into the doctor's

office with him.

### C. The Defendant's Standardless NTA Issuance Guaranteed Error

Lastly, the method by which Defendant stripped Mr. Cyr's rights was constitutionally infirm for its high "risk of an erroneous deprivation of such interest[s]." *Mathews*, 424 U.S. at 335. Defendant performed no evaluation of the evidence before removing Mr. Cyr's ability to attend and speak at school board meetings. Ryan, whose approval was necessary for both NATs, made no effort to determine whether Doty had greatly embellished her account of the Cyrs' September drive-by waving, not even by interviewing the colleague who had been in Doty's office and seen the brief visit. Incredibly, Ryan asked no questions of Dr. Cotton after receiving her letter, but simply discussed the letter with the very staff members who fed Cotton the allegations. By way of comparison, no government agency would be permitted to list a person on a child abuse registry based upon a single report and zero factual corroboration beyond the person reporting the allegation. *See Valmonte v. Bain*, 18 F.3d 992, 1004 (2d Cir. 1994) (holding due process violated by likelihood of error in state registry's "some credible evidence" standard, which required no weighing of competing facts). *Cf. McCollum v. Miller*, 695 F.2d 1044, 1048-9 (7th Cir. 1982) (unacceptable risk in disciplining even "the most dangerous federal prisoners" on the basis of confidential tips, absent additional safeguards).

Lastly, the defendant's lack of policies governing the issuance of NAT's, their duration, or a mechanism for contesting their issuance is "particularly problematic" for its propensity to invite error. *Catron v. City of St. Petersburg*, 658 F.3d 1260, 1268 (11th Cir. 2011) (striking trespass ordinance for same deficiencies). The allegations underlying the September 2011 NAT, for example, were deemed sufficient to issue the order, then became insufficient three weeks later when it was rescinded, only to be revivified in March 2012 as the basis for a new NAT , the only additions being the imprimatur from Dr. Cotton, and the protected speech on the WCAX

website erroneously attributed to Marcel. Such whipsawing of liberty interests is not tolerated by the Fourteenth Amendment, and judgment should enter for him on Count 2.

## V. Conclusion

Because the undisputed facts show that Defendant violated Mr. Cyr's First Amendment rights to gather information and express himself, and because the same facts show that Defendant deprived him of those rights without due process, summary judgment should enter in his favor.

/s/ Dan Barrett
Dan Barrett
ACLU Foundation of Vermont
137 Elm Street, Montpelier, VT 05602
(802) 223-6304
e-filings@acluvt.org

/s/ Edwin L. Hobson
Edwin L. Hobson
289 College Street
Burlington, VT 05401
(802) 863-2000
ted@tedhobson.com

*Counsel for Marcel Cyr*

January 27, 2014

**Plaintiff's Statement of Undisputed Material Fact**

1. Marcel Cyr resided in Benson, Vermont with his wife Veronica and their two children Autumn and Edmund from 2005 through the late summer of 2012.

   Source: Marcel Cyr deposition [Ex. 1] 12:1-12:6.

2. Mr. Cyr is a physically large man.

   Source: Ron Ryan deposition [Ex. 2] 91:13.

3. Mr. Cyr has worked jobs operating heavy machinery without hearing protection.

   Source: Marcel Cyr 164:13-165:1.

4. Mr. Cyr has hearing loss causing him difficulty following conversations when he cannot look at the person speaking,

   Source: Marcel Cyr 4:17-24.

5. Mr. Cyr's hearing loss causes him to speak loudly.

   Source: Marcel Cyr 165:6-12.

6. Benson school board members are elected townwide.

   Source: Amy Munger deposition [Ex. 3] 16:17-21; Tom Neumann deposition [Ex. 4] 14:4-9.

7. The Benson school board meets once a month.

   Source: Michael Ellis deposition [Ex. 5] 5:23-6:1.

8. Benson school board meetings are held in the Village School library or gymnasium.

   Source: Ellis 6:2-10.

9. Benson school board meetings are open for public attendance.

   Source: Kim Doty deposition [Ex. 6] 4:14-17; Ryan 43:19-22; Kristin Benway deposition [Ex. 7] 44:22-45:1; Bobbi Bean deposition [Ex. 8] 13:22-24; Jody Goodhue deposition [Ex. 9] 9:21-24; Ellis 13:12-15; Munger 20:16-21; Neumann 19:7-10.

10. A portion of each Benson school board meetings is devoted to public comment.

    Source: Ryan 44:14-45:1; Doty 65:6-9; Benway 45:2-5; Bean 14:16-18; Goodhue 10:4-7; Ellis 22:1-8; Munger 21:13-18; Neumann 19:11-20.

11. Members of the public are permitted to speak at portions of Benson school board meetings other than the public comment agenda item.

    Source: Doty 64:24-65:5; Ellis 33:3-17; Goodhue 10:4-12; Neumann 19:11-20.

12. The Benson school board's three prohibited public comment subjects are a matter of practice rather than written policy.

    Source: Goodhue 13:18-25; Neumann 25:7-15; Munger 23:11-12; Bean 18:11-16.

13. Speakers at Benson school board meetings may not identify a specific student in their comments, including the speaker's own child.

    Source: Bean 17:12-22; Goodhue 14:18-15:2. *See also* Ellis 25:19-21 ("[O]nce it becomes my son, my daughter, you know, whatever, that's specific and that's something that we cannot discuss in the open."); Munger 25:4-8 (testifying that a parent violates the policy by telling the board "my child Billy told me he loves the school").

14. Speakers at Benson school board meetings may not identify a specific staff member in their comments.

    Source: Munger 23:3-10; Bean 16:20-25.

15. Speakers at Benson school board meetings may not identify "specific instances" occurring in or out of school in their comments.

    Source: Munger 26:16-27:3.

16. Speakers at Benson school board meetings may not discuss "legal matters" during their comments.

    Source: Ellis 23:5-13.

17. The Benson school board has violated its prohibitions against speech by addressing one of the prohibited topics, or permitting members of the public to do so.

    Source: Goodhue 13:13-17 (stating that students are permitted to be identified by name for purposes of being praised); Munger 25:24-26:4 (same for staff members); Minutes of Aug. 10, 2010 school board meeting [Ex. 10] 1 (member of public praises Kim Doty for volunteering for town's Burdock Festival); Minutes of Sep. 14, 2010 school board meeting [Ex. 11] 1 (member of public praises school's athletic director as "doing a very good job" and being "a good choice for the position."); Minutes of May 8, 2012 meeting [Ex. 11] 1-2 (member of public speaks about possible illegality in board mailing to voters re. the budget).

18. Addison Rutland Supervisory Union superintendent Ron Ryan and Benson Village School principal Kim Doty attend every Benson school board meeting as part of their job duties.

    Source: Ryan 38:20-25; Doty 57:21-25.

19. Ryan, Doty, and all board members believe that public attendance and participation help the community to keep apprised of the goings-on at the school, and give officials the opportunity to hear concerns directly from voters.

    Source: Ryan 46:6-47:2; Doty 66:5-67:9; Bean 14:15-15:3; Ellis 23:14-24:8; Goodhue 10:17-11:6; Munger 22:11-23; Neumann 22:5-21; Benway 42:1-9.

20. Marcel Cyr once ran unsuccessfully for the Benson school board.

    Source: Marcel Cyr 170:7-21.

21. Some school officials considered it disruptive of a board meeting when a speaker addressed one of the three prohibited subjects during her or his comments.

    Source: Munger 29:24-30; Doty 74:23-75, 77:14-79:11.

22. Marcel Cyr's behavior at school board meetings was unremarkable.

    Source: Ryan 91:9-17.

23. Marcel Cyr never caused an actual disruption of a school board meeting.

    Source: Munger 31:18-21; Ellis 33:1-3; Goodhue 15:9-12.

24. Marcel Cyr never threatened the school board.

    Source: Ellis 35:3-5; Bean 28:3-5; Goodhue 15:13-15; Neumann 27:25-28:4; Doty 74:18-22.

25. Marcel Cyr never argued with another member of the public at a school board meeting.

    Source: Munger 31:22-24; Neumann 28:5-7; Bean 28:6-11; Goodhue 15:16-19.

26. Mr. Cyr never engaged in any behavior that necessitated summoning the police to a school board meeting.

    Source: Ellis 32:23-25; Munger 32:5-7.

27. Once, one of the Cyrs' signs was knocked over during a school board meeting, so the pair occasionally sat in their parked car nearby to ensure that no one stole or knocked down their signs during the board meeting.

    Source: Marcel Cyr 173:5-22.

28. The Cyrs displayed signs on their family car with their opinions about school policy.

    Source: Marcel Cyr 170:22-171:19.

29. At least one board member, and superintendent Ron Ryan, learned of the Cyrs' views from their signs.

    Source: Neumann 29:10-22 (sign outside school); Ryan 52:18-53:2 (sign on car).

30. Under the name "Parents for Positive Change," the Cyrs also printed flyers advocating their views, and Marcel handed them out at the local grocery store.

    Source: Benway 112:3-10; Veronica Cyr deposition [Ex. 13] 102:12-103:1.

31. During his time in Benson, Edmund Cyr was diagnosed with a disorder on the autism spectrum.

    Source: Nancy Cotton deposition [Ex. 14] 45:19-20.

32. Meetings between the Cyrs and school staff about Edmund were sometimes cordial.

    Source: Benway 85:20-86:5.

33. School staff and Edmund's parents developed communications difficulties during meetings about the boy.

    Source: Benway 75:24-76:3.

34. Veronica and Marcel Cyr share an email account, and signed letters to the school jointly.

    Source: Doty 104:17-22.

35. Veronica and Marcel sometimes sent school staff the same message via letter, email, and telephone call.

    Source: Benway 83:17-24.

36. Occasionally, Marcel Cyr hand-delivered letters to the school.

    Source: Doty 100:14-16.

37. Kristin Benway believed Marcel interpreted information in a literal way that rendered ambiguity difficult to process, and perhaps has a learning disability.

    Source: Benway 86:6-87:2.

38. Kris Benway perceived Mr. Cyr to be agitated during some meetings with staff.

    Source: Benway 80:7-12.

39. Kris Benway observed Mr. Cyr Benway "barraging [staff] with multiple questions at one time" during some meetings.

    Source: Benway 78:19-24.

40. Kris Benway believed that some staff found Mr. Cyr's speech volume and demeanor during meetings to be intimidating.

    Source: Benway 81:16-21.

41. Benway found that having Doty attend meetings by telephone reduced tensions.

    Source: Benway 82:1-11.

42. The Cyrs' inquiries and criticisms made Doty and her staff feel "very threatened about their professional integrity and their expertise."

    Source: Doty 27:9-28:5.

43. Doty acknowledged that her umbrage at being criticized was not the same as feeling physically threatened.

    Source: Doty 28:6-18.

44. When Edmund Cyr's therapist reported that the boy had said that he wanted to "come after" Doty "with an axe" during a counseling session, Doty assumed that the boy was repeating Marcel's words. She did not ask the Cyrs about the boy's comments.

    Source: Doty 151:11-152:23, 153:17-25.

45. A teacher reported to Kim Doty that she was spooked by seeing Mr. Cyr drive by her house. The Cyrs have a longtime friend who lives on the same road as the teacher, near where they shop.

Source: Benway 93:10-14, 95:1-17 (recounting teacher's report); Veronica Cyr 103:17-104:2 (explaining that entire Cyr family had seen the teacher when they drove by); Marcel Cyr 174:17-175:11 (same).

46. A staff member was concerned that the Cyrs had parked near school property during a board meeting.

Source: Benway 99:1-17.

47. A board member who lives in the center of Benson witnessed Mr. Cyr driving past with signs on his car, honking the car horn.

Source: Goodhue 37:25-38:9; 43:5-20, 46:25-47:17.

48. A staff member reported that Marcel displayed his middle finger to her on a public road on a summer day.

Source: Doty 105:2-106:8.

49. Mr. Cyr has a habit of "flipping . . . the bird" when the driving of other motorists bothers him.

Source: Marcel Cyr 175:17-24.

50. A supervisory union board member thought he heard Marcel say something "very derogatory . . . and I thought threatening" about Ron Ryan while telling the board member that he thought Ryan should be fired, but does not remember what.

Source: Donald Knapp deposition [Ex. 15] 20:12-16.

51. Ron Ryan was "not terribly surprised" by what the supervisory union board member thought he heard.

Source: Knapp 26:16.

52. Mr. Cyr never threatened staff at any meeting.

Source: Benway 81:14-21; Doty 25:20-25.

53. Mr. Cyr has never threatened staff when delivering correspondence to school.

Source: Doty 100:11-14.

54. Mr. Cyr has never sworn at staff.

Source: Benway 81:9-13; Ryan 17:17-18:2.

55. Doty never asked the Cyrs to change the frequency or tone of their communications with staff.

Source: Doty 117:23-118:22.

56. During Kim Doty's tenure at the school, two parents have fought in the school parking lot.

Source: Doty 6:8-15; 14:23-4.

57. During Kim Doty's tenure at the school, an enraged parent menaced a pregnant teacher, who barricaded herself in the nurse's office until police arrived.

Source: Doty 15:6-16:17; 19:11-21.

58. During Kim Doty's tenure at the school, a father "barged in" to Doty's office after school, "screaming at [her], swearing at [her] . . . in [her] face with his finger."

Source: Doty 21:18-22:25.

59. During Kim Doty's tenure at the school, two parents accused each other of having threatened the other's child.

Source: Doty 29:15-31:6.

60. None of the parents referenced in Undisputed Facts ## 56-59 were barred from school property.

Source: Doty 96:23-25 (Doty has only issued one notice against trespass, to Mr. Cyr).

61. Doty sent the parent who menaced the pregnant teacher a letter requesting that she change her behavior.

Source: Doty 17:11-15.

62. Doty repaired the relationship with the enraged father by talking with him about the incident.

Source: Doty 35:6-36:12.

63. Doty has received "thousands" of letters from parents about "[t]hings [staff] weren't doing; things we were doing wrong."

Source: Doty 32:18-33:8.

64. Doty found those letters to be "professionally threatening" as she did the Cyrs'.

Source: Doty 34:1-4.

65. On the day they passed the school on their way camping, the Cyrs had been communicating with Doty during the day, hoping to arrange for Edmund to visit his classroom before the year began, to reduce his anxiety.

Source: Veronica Cyr 104:7-14; Doty 106:22-107:3.

66. Unable to arrange a time, the Cyrs decided to drive by the school on their way out of town so as to re-acquaint Edmund with the school.

Source: Veronica Cyr 104:7-12.

67. Mr. Cyr drove the family car through the school's circular drive, honked the car's horn once, and the entire family waved.

Source: Veronica Cyr 104:13-18.

68. The Cyrs did not stop in front of the school.

Source: Doty 107:18-21.

69. Doty was in her office with a colleague, and did not see the car until her colleague told her to look out the window as it drove away.

Source: Doty 107:6-21.

70. Doty "clearly received" that the "message" of the family's drive-by wave was "you lied to us or whatever it was but I should have been able to see that classroom, beep, beep, Ms. Doty, we know you're in the building."

Source: Doty 107:22-108:1.

71. Doty did not call the police about the Cyrs' drive-by wave.

Source: Doty dep. 110:14-16.

72. Doty asked Ron Ryan's permission to issue Mr. Cyr a notice against trespass ("NAT").

Source: Doty dep. 110:19-112:5.

73. Doty needed Ryan's permission to issue the NAT.

Source: Doty 95:9-96:12; Ryan 70:3-9.

74. Ryan's permission was sufficient for the NAT to issue without further approval.

Source: Doty 120:13-20; Bean 40:23-41:1; Goodhue 23:8-13; Munger 37:16-20; Neumann 42:22-43:3.

75. The Addison Rutland Supervisory Union has no policies or procedures governing use or breadth of NATs.

Source: Doty 94:8-17; Ryan 63:7-10.

76. The Addison Rutland Supervisory Union has never trained Doty or Ryan about NATs.

Source: Doty 94:5-7; Ryan 63:2-6.

77. Kim Doty is unaware that NATs can be issued for lengths of time longer or shorter than two years.

Source: Doty 97:7-14.

78. Kim Doty believes that an issuer of a NAT has no obligation to tell the recipient why it has been issued.

Source: Doty 119:2-6.

79. When speaking with Ryan about the Cyrs' daylight drive-by wave, Kim Doty told him that "she had been there late a few nights and [Marcel] had driven by her window and he was the only car in the parking lot and she . . . felt that, you know, her life was possibly in danger from this guy."

Source: Ryan 69:6-11.

80. Ryan did not investigate Doty's allegations, but gave her permission to issue the NAT.

Source: Ryan 73:7-16.

81. When informing him about the NAT she issued, Doty told school board chair Mike Ellis that Marcel "would on a daily basis drive up beside the office" honking his car horn and giving "the finger" to teachers.

Source: Ellis 46:20-47:9.

82. Doty filled out a blank form that the Fair Haven Police Department makes available for NATs.

Source: William Humphries deposition [Ex. 16] 35:17-22.

83. Doty did not ask the police to investigate Mr. Cyr.

Source: Doty 99:19-21.

84. Nothing Doty told Police Chief William Humphries suggested to him that Mr. Cyr had committed a crime.

Source: Doty 99:22-23; Humphries 23:18-21; *id.* 25:5-26:5. *See also id.* 15:6-9 (Chief Humphries has never had a request for a NAT prompt a criminal investigation).

85. Chief Humphries told Doty that a NAT would not preclude Mr. Cyr from telephoning or emailing her or school staff.

Source: Humphries 38:4-18.

86. On September 6, 2011, Mr. Cyr was served with the NAT barring him from "all building, property & parking lot owned by school [sic]."

Source: Humphries deposition ex. 1.

87. Mr. Cyr was not given a reason for the NAT's issuance, or told how to contest it.

Source: Marcel Cyr 171:20-25; Doty 117:23-118:2.

88. When the school board convened for its September 2011 meeting, Marcel could not attend because of the NAT, but Mrs. Cyr did.

Source: Marcel Cyr 182:15-25.

89. When Mrs. Cyr asked why her husband had been banned at the school board meeting, Kim Doty shrugged and said that "we don't need a reason."

Source: Veronica Cyr 110:23-11:4.

90. Another member of the public asked if Marcel was a danger to the school, and Ryan responded that "if there was a threat to the student population you would be notified."

Source: Minutes of Sep. 13, 2011 Benson school board meeting [Ex. 17] 1-2.

91. No such notification about Mr. Cyr has ever been issued.

Source: Ryan 28:23-30:3 (Defendant has an electronic emergency warning system to broadcast messages to parents, but it has never been activated for a suspicious person, school lockdown, or other threat.)

92. The September 2011 NAT was withdrawn by Doty three weeks later after she issued it.

Source: Letter from Kim Doty to Marcel Cyr (Sep. 28, 2011) [Ex. 18].

93. Doty withdrew the September 2011 NAT because she decided that it was in Edmund's interests for staff to have a working relationship with the Cyrs.

Source: Doty 114:17-115:12.

94. After lifting the NAT, Doty did not ask Mr. Cyr to change any of his behaviors or methods of communicating with staff.

Source: Doty 118:3-119:1.

95. The Cyrs and the defendant were arranging an evaluation of Edmund for the coming 2012-2013 school year.

Source: Benway 66:19-67:2.

96. Nancy Cotton spent March 15th at the school meeting with staff, who provided her with some of Mr. Cyr's correspondence, and staff notes of meetings.

Source: Cotton 10:3-9.

97. One staff member told Cotton the account of Marcel driving by her house, although there were no suspicious circumstances for seeing him there, as set forth in Undisputed Fact # 45.

Source: Cotton 15:3-6.

98. A staff member told Cotton that a Parents for Positive Change flyer was "printed with the individual . . . name of a teacher" who was criticized.

Source: Cotton 15:17-23.

99. Cotton never saw the Parents for Positive Change flyer.

Source: Cotton 25:16-17.

100. The flyer does not name any teacher.

Source: Parents for Positive Change flyer [Ex. 19].

101. Cotton considered the flyer to constitute "[p]ersonalized attacks" on staff.

Source: Cotton 24:19-25.

102. Doty told Cotton that the circumstances of the Cyrs' September 2011 drive-by of the school were that it was a "darkened school, no one else there except her, working in her office . . . with a light on, and a truck going back and forth honking, and she looked out and it was Mr. Cyr."

Source: Cotton 15:7-14. Doty confirmed that it was she who told Cotton about the drive-by. Doty 141:14-15.

103. Cotton has never met Marcel Cyr.

Source: Cotton 8:11-13.

104. Based upon what staff told her about Mr. Cyr, Dr. Cotton thought she was obligated under state law to warn the school that Mr. Cyr might pose a danger to it.

Source: Cotton 38:20-23.

105. She told Benway and Doty that "they had a potential for violence in their school," and recommended they "request . . . an independent mental health assessment of Mr. Cyr's mental status."

Source: Cotton 18:15-20.

106. Cotton told them that "she was speaking . . . as a clinical psychologist," because she considers every conclusion reached while "working in a professional capacity" to be a "clinical opinion."

Source: Benway 94:7-9; Cotton 38:24-39:7. *See also, e.g.,* Cotton 10:15-11:1 (describing the conclusion she reached on March 15th as a clinical opinion).

107. It did not matter to Dr. Cotton whether the information given to her about Mr. Cyr was accurate.

Source: Cotton 11:23-12:2.

108. Cotton made no attempt to verify any of the information that staff had told her about Mr. Cyr.

Source: Cotton 16:18-17:1.

109. Cotton reached no conclusion as to whether Mr. Cyr actually posed a threat of violence, because she had not conducted an assessment of him.

Source: Cotton 44:8-14; 64:6; 71:18-22.

110. Benway, Doty, and Cotton left their meeting on March 15, 2012 without plans to take any steps about Mr. Cyr.

Source: Benway 106:16-18; Cotton 36:20-37:17.

111. Kim Doty told Ron Ryan about Cotton's March 15, 2012 warning.

Source: Doty 144:5-22.

112. On March 22, 2012, Benway telephoned Cotton about a comment that had been posted in response to a story on WCAX-TV's website, reporting that the defendant's teachers had filed an unfair labor practice complaint.

Source: Cotton 29:17-30:11.

113. Benway told Cotton that Mr. Cyr wrote the comment, because the author was identified as "Parents for Positive Change."

Source: Benway 111:25-112:10.

114. The comment read:

> When dealing with snakes, you must expect them to twist and turn in an attempt to bite you, any way they can. The teachers will do anything to force there will on the taxpayer. Up to and including taking it out on the Kids. the best way to deal with a snake is to remove the head. “If they Strike fire them”.

Source: Benway deposition ex. 2.

115. Benway did not investigate whether Mr. Cyr had written the comment.

Source: Benway 115:10-11.

116. Veronica Cyr wrote the comment.

Source: Veronica Cyr 105:3-106:13; Marcel Cyr 142:16-25.

117. Cotton thought the comment represented a “dehumanization of people,” which she opined was a risk factor for violence.

Source: Cotton 30:17-19; Benway 119:2-7.

118. The defendant asked Dr. Cotton to write down her warning.

Source: Cotton 34:10-12.

119. The defendant told Dr. Cotton that it wished for her to write her warning down “to be sure that it was clear that it came from [Cotton], that it was [Cotton’s] suggestion,” *i.e.*, that “they weren’t doing this before [she] came.”

Source: Cotton 34:14-22.

120. On March 23, 2012, Cotton faxed the requested letter to Ron Ryan. Cotton wrote that staff's accounts of Marcel caused her to suspect that "there was potential risk of violence to them," and quoted Veronica's snake allegory. "In my clinical opinion," Cotton concluded, "this is a serious threat in the context of dehumanizing people by comparing them to animals."

Source: Ex. 2 to Nancy Cotton deposition.

121. Ryan had already heard the allegations in Cotton's letter before March 23, 2012, including the "snakes" comment.

Source: Ryan 75:1-4; 57:1-5; 77:14-78:5.

122. Ryan did not call 911 in response to the Cotton letter.

Source: Ryan 79:12-15.

123. Ryan did not contact Cotton to discuss her letter.

Source: Cotton 73:10-13.

124. Ryan did no investigation of the allegations other than to talk with Benway and Doty.

Source: Ryan 75:18-76:1.

125. On March 26, 2012, eleven days after Cotton's verbal warning, Ryan contacted Chief Humphries of the Fair Haven police about issuing Mr. Cyr an NAT.

Source: Ryan 74:17-21; 78:16-17.

126. Ryan did not report a possible crime or ask Humphries to investigate Mr. Cyr.

Source: Humphries 30:5-9.

127. Ryan filled out and signed a form NAT.

Source: Ryan 78:15-17.

128. The NAT barred Mr. Cyr from all of Defendant's property for two years, without any explanation of reasons or of how to contest the NAT.

Source: Humphries deposition ex. 2.

129. Ryan does not know of any impermissible reasons for a NAT.

Source: Ryan 64:8-12.

130. Ryan does not know whether a NAT issuer is required to provide the person excluded with the reasons for the notice.

Source: Ryan 64:16-19.

131. Ryan does not know how a NAT recipient may contest one's issuance.

Source: Ryan 65:7-10.

132. Ryan barred Mr. Cyr from all property in the supervisory union even though Marcel had never appeared at any school other than Benson.

Source: Ryan 81:21-82:5.

133. Ryan barred Mr. Cyr from all property in the supervisory union even though Mr. Cyr's behavior at supervisory union headquarters "was fine."

Source: Ryan 82:25.

134. Ryan never considered restricting the March 2012 NAT to classrooms and offices rather than all property in the union.

Source: Ryan 83:1-8.

135. Ryan issued the NAT for two years because the two year term was pre-printed on the bottom of the Fair Haven police form that he chose to use.

Source: Ryan 64:22-65:6; 85:23-86:6.

136. After Mr. Cyr inquired about the reasons for the March 2012 NAT, its lawyer told him only that the supervisory union "was in receipt of written information submitted under a professionals' [sic] duty to warn."

Source: Letter from Heather Thomas Lynn to Marcel and Veronica Cyr 1 (Mar. 28, 2012) [Ex. 20].

137. The defendant suggested that it might reconsider the ban if Mr. Cyr underwent a mental health risk assessment, but did not explain what such an assessment entails or whether the results would be kept confidential.

Source: Ex. 20 at 1.

138. Mr. Cyr filed a public records request for documents showing the reasons for the March 2012 NAT.

Source: Compl. app. B [ECF # 1-2].

139. Veronica Cyr brought her daughter Autumn to the April 10, 2012 school board meeting.

Source: Veronica Cyr 112:3-5.

140. Ryan and board chair Mike Ellis had agreed beforehand to stop anyone from trying "to plead [Marcel's] case."

Source: Ellis deposition exhibit 4.

141. When Autumn rose to read a letter about the NAT, Ellis told her that she was not permitted to speak about the subject, on account of the board's "legal matter" prohibition.

Source: Veronica Cyr 100:22-101:6.

142. Ryan had a police officer attend the meeting in case Marcel showed.

Source: Ryan 83:14-84:8; Veronica Cyr 99:15-100:5.

143. Marcel has perfectly obeyed both NATs.

Source: Doty 158:8-14; Ryan 71:20-72:2, 83:9-11.

144. Two days after the meeting, the supervisory union sued Mr. Cyr in the Vermont Superior Court, asking the court to declare that it need not comply with his public records request.

Source: Ryan deposition exhibit 2.

145. Later in April, Marcel asked the defendant to move board meetings to a location where he would not risk arrest for attending. The defendant advised Mr. Cyr that that he could attend by telephone.

Source: Letter from Ron Ryan to Marcel Cyr 1 (Apr. 27, 2012) [Ex. 21].

146. Defendant made clear that if Mr. Cyr attended board meetings by telephone, the board would not discuss the NAT.

Source: Exhibit 21 at 2.

147. Based upon his hearing deficiency, the poor acoustics of the school library and gym, and his concern that he was being excluded from the community, Mr. Cyr declined. He also declined an offer to attend via "TTY/TRS/VCO or CART," as he does not know what those are.

Source: Marcel Cyr 154:8-156:3; *id.* 181:15-23; *id.* 131:24-132:4. Veronica Cyr 83:23-85:1.

148. In November 2012, the supervisory union produced the Cotton letter seven months after banning Mr. Cyr.

Source: Letter from Ron Ryan to Marcel Cyr (Nov. 8, 2012) [Ex. 22].