UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

MARCEL CYR,                              :
                                        :
        Plaintiff,                      :
                                        :
                v.                      :        Case No. 1:12-cv-105-jgm
                                        :
ADDISON RUTLAND                         :
SUPERVISORY UNION,                      :
                                        :
        Defendant.                      :
_____:

MEMORANDUM AND ORDER
(Docs. 48, 49)

I.    Introduction

        Plaintiff Marcel Cyr brings this civil rights action against the Addison Rutland Supervisory

Union ("ARSU" or "Union").  Mr. Cyr, whose children attended the Benson Village School

("Benson school") in the ARSU, alleges violations of the First and Fourteenth Amendments based

on the Union's issuance of two notices against trespass prohibiting him from entering onto Union

property.  Specifically, Mr. Cyr claims that the ARSU violated his First Amendment right of access

to school board meetings, his First Amendment right to free expression, and his Fourteenth

Amendment right to due process.

        Both parties have moved for summary judgment.  (Docs. 48, 49.)  For the reasons below,

Plaintiff's motion is GRANTED IN PART and DENIED IN PART.  Mr. Cyr's motion is granted

as to his First Amendment freedom of expression claim and his related Fourteenth Amendment due

process claim.  Mr. Cyr's motion is denied as to his First Amendment right of access claim, and

summary judgment is entered against Mr. Cyr on this claim.  Defendant's motion is DENIED.

II.   <u>Factual Background</u>[1]

Mr. Cyr and his wife, Veronica, lived with their two children in Benson, Vermont, from 2005 to 2012.  While in Benson, the Cyrs' son was diagnosed with a disorder on the autism spectrum. The Cyrs often raised concerns about their son's education and other issues related to the school, and Mr. Cyr testified that as many as 5,000 documents have gone back and forth between the Cyrs and the school regarding their criticisms.  They displayed signs on the family car and handed out flyers advocating their views.  The Cyrs have also previously filed several administrative complaints against the ARSU and Benson school.

Mr. Cyr is a physically large man and contends he has hearing loss from operating heavy machinery, which causes him to speak loudly and makes following some conversations difficult for him.  (Doc. 48 ¶¶ 2-5.)  He has never sought treatment for hearing loss.  (Doc. 53-6 ¶ 44.)  Some Benson school staff -- including Director of Special Services Kristin Benway and Principal Kim Doty -- were intimidated by Mr. Cyr, who personally delivered his letters to the school on nearly a daily basis.  (Doc. 48 ¶¶ 40, 42.)   Benway testified that at some meetings between Mr. Cyr and school staff about the Cyrs' son, Mr. Cyr leaned over and spoke loudly with a clenched fist. (Doc. 53-6 ¶ 11.)  The teacher of the Cyrs' son reported to Principal Doty that she was intimidated after once seeing Mr. Cyr drive by her house in New York.[2]  (Docs. 48 ¶ 45; 54-1 ¶ 45.)

The Cyrs attended several Benson school board meetings, which occur monthly in the library or gymnasium.  (Doc. 48 ¶¶ 7-8.)  After a sign they had placed outside of one meeting was

---

[1] The facts are gleaned from the parties' submissions.  Unless otherwise indicated, the facts are undisputed.

[2] The parties dispute whether Mr. Cyr drove by to visit a friend who lives on the same road or whether it was connected to his conflicts with the teacher and school.  (Docs. 48 ¶ 45; 54-1 ¶ 45.)

knocked down, the Cyrs sometimes waited in their car and watched to make sure it did not happen

again.  Benson school staff and board members felt threatened when the Cyrs parked near school

property and watched them leave meetings.  (Doc. 54-1 ¶ 46.)

      In August 2011, the Cyrs' son told a therapist he wanted to attack Principal Doty with an ax.

(Docs. 48 ¶ 44; 53-6 ¶ 12; 54-1 ¶ 44.)  Doty was scared because she believed he was repeating his

father's words.  She learned about the comments after the boy's therapist contacted the school

under what the therapist believed was her "duty to warn."  (Doc. 54-1 ¶ 44.)  A few days later, the

Cyrs contacted Doty to arrange a time to see their son's classroom before the commencement of the

school year.  Doty testified that the Cyrs "relentlessly" demanded to visit two days before school

started, but she told Mr. Cyr they would have to wait until the day before school started.

(Docs. 53-6 ¶ 14; 54-1 ¶¶ 65-66.)  Two days before school commenced, the Cyr family, on the way

out of town to go camping, drove by the school at approximately 5:00 p.m.  (Doc. 54-1 ¶ 68.)  Mr.

Cyr drove through the circular driveway, honked, and the family waved.[3]  Principal Doty and school

counselor Kristin Morrison were the only ones in the school at the time, and Doty found Mr. Cyr's

action threatening in light of his repeated demands to visit that day and his son's recent comments

to the therapist (which Doty attributed to Mr. Cyr).  She told ARSU Superintendent Ron Ryan

about the incident and then contacted Fair Haven Police Chief William Humphries for advice.

Humphries made her aware that issuing a notice against trespass was an option, and after

consultation with Superintendent Ryan, Doty issued a notice against trespass to Mr. Cyr.  The notice

was served on September 6, 2011.   The parties dispute whether Doty needed Ryan's permission to

---

     [3] Mr. Cyr and his wife both testified that they beeped and waved at Benson custodian Dan
Ransom, who they said was setting up soccer goals.  (Doc. 54-1 ¶ 67.)  In an affidavit, Ransom
stated he did not work past 4:00 p.m. any day during that time, did not set up soccer goals until after
the school year began, and does not remember ever seeing or hearing Mr. Cyr drive by or honk at
him.  (Doc. 54-6 ¶¶ 6-10.)

issue the notice, but they do not dispute that Superintendent Ryan agreed with Principal Doty's decision to issue the notice.  (Docs. 48 ¶¶ 73, 80; 54-1 ¶¶ 73, 80)  The notice barred Mr. Cyr from all property owned by the ARSU for two years, the amount of time pre-printed on the notice.  The parties dispute whether Mr. Cyr was given a reason for the issuance of the notice or told how to contest it.  (Docs. 48 ¶ 87; 54-1 ¶¶ 78, 87.)

Because of the notice against trespass, Mr. Cyr could not attend the September Benson school board meeting.  His wife attended instead and asked why her husband was banned from the meeting.  The parties dispute whether Principal Doty shrugged and told Mrs. Cyr they did not need a reason to issue a notice.  (Docs. 48 ¶ 89; 54-1 ¶ 89.)  According to the board meeting minutes, a parent asked if Mr. Cyr was a threat to children and Superintendent Ryan apparently said, "we can't comment at this point, but if there was a threat to the student population you would be notified." (Docs. 48 ¶ 90; 54-1 ¶ 90.)

Doty withdrew the notice against trespass on September 28, 2011.  (Doc. 48-19 at 2.)  The ARSU contends the notice was withdrawn after the school worked out a "new communication plan" with the Cyrs in consultation with Vermont Legal Aid and the Disability Law Project.  (Doc. 54-1 ¶¶ 87, 92.)  According to the ARSU, Disability Law Project paralegal Sherrie Brunelle agreed to act as a buffer between the Cyrs and the school, and meetings were moved to the ARSU's offices so Doty could attend via phone to avoid meeting with Mr. Cyr in person.  (Doc. 49-2 ¶ 19.)  Mr. Cyr, on the other hand, contends that Vermont Legal Aid and the Disability Law Project represented only his son, not him or his wife, and testified he did not know anything about the Union's arrangement with those organizations concerning the notice against trespass.  (Doc. 53-6 ¶ 19.)

In February and March 2012, the Cyrs -- through counsel at Vermont Legal Aid and the Disability Law Project -- agreed to have Dr. Nancy Cotton, a psychologist, evaluate their son as part

of an effort to reintegrate him into the Benson school.  On March 15, 2012, Dr. Cotton met with
school staff.  She had previously reviewed the school's records of its communications with Mr. Cyr,
along with other correspondence and staff notes.  (Docs. 48 ¶ 96; 54-1 ¶ 96.)  After the meeting, Dr.
Cotton asked to speak with Principal Doty and Director of Special Services Kristin Benway
regarding her concerns about Mr. Cyr's mental status and the potential risk he presented to school
staff.  Although she had not planned on forming a clinical opinion about him, Dr. Cotton developed
concerns about Mr. Cyr after reviewing records and interviewing staff.  (Doc. 54-1 ¶ 106.)  She had
intended to interview Mr. and Mrs. Cyr as well, but after becoming concerned for her own safety,
Dr. Cotton decided not to meet with the Cyrs at their home or her office and would only meet at
their lawyer's office with the lawyer present.  (Doc. 54-1 ¶ 110.)  The Cyrs ultimately canceled the
interview.

   When Dr. Cotton learned the Cyrs had declined to participate in an interview, she told
Director Benway to be concerned about Mr. Cyr's "escalating pattern of behaviors."  Benway then
told Dr. Cotton about a web site on which the screen name "Parents for Change" had posted the
following:

> When dealing with snakes, you must expect them to twist and turn in an attempt to
> bite you, any way they can.  The teachers will do anything to force there [sic] will on
> the taxpayer.  Up to and including taking it out on the Kids. [T]he best way to deal
> with a snake is to remove the head.  "If they strike fire them."

Mr. Cyr had previously posted comments online using the "Parents for Change" screen name, and
Director Benway associated Mr. Cyr with the screen name because of the printed flyers that Mr. and
Mrs. Cyr distributed.  (Doc. 53-6 ¶ 29.)  The posting was related to an article about teacher contract
negotiations.  The parties dispute whether Mr. or Mrs. Cyr authored the online posting.
(Docs. 48 ¶ 116; 54-1 ¶ 116.)

Dr. Cotton thought the online comment was "a serious threat in the context of dehumanizing people by comparing them to animals[,] which can further justify violence." (Doc. 49-1 at 4.)  Based on her previous concerns in reviewing school records and speaking with staff, as well as the online posting, Dr. Cotton believed she had a professional obligation to warn the school that Mr. Cyr might pose a danger to it.  See id.  The ARSU did not ask Dr. Cotton to provide such a warning, but requested she put it in writing in order to make clear it was her opinion rather than one of the Benson school.  Dr. Cotton's letter recommended the Union "require an independent mental health risk assessment to be conducted to assess Mr. Cyr's mental status, including his thinking processes, potential for violent actions, and ability to participate in the necessary school/home collaboration required with a student with a developmental disorder requiring individualized educational planning."  Id. at 3.

On March 26, 2012, Superintendent Ryan issued a second notice against trespass to Mr. Cyr based on Dr. Cotton's letter and consultation with Director Benway and Principal Doty.  The notice again barred Mr. Cyr from all ARSU property for two years, which was the period of time pre-printed on the Fairhaven police form. (Docs. 48 ¶ 128; 54-1 ¶ 128.)  After issuing the notice, the Union told Mr. Cyr it would reconsider if he underwent a mental health risk assessment as recommended by Dr. Cotton.  (Doc. 53-6 ¶ 39.)  The Union also offered Mr. Cyr the ability to attend school board meetings via telephone or through the use of various "assistive technologies." (Doc. 53-6 ¶ 41.)  Mr. Cyr declined this offer and contends he did not know what the technologies were and did not have access to them.  (Doc. 53-6 ¶ 43.)  The parties dispute whether the assistive technologies would have allowed Mr. Cyr to effectively participate due to Mr. Cyr's alleged hearing problem and the acoustics of the rooms in which the board meetings were held.  (Docs. 49-2 ¶ 43;

6

53-6 ¶ 43.)  Mr. Cyr did not attend several board meetings, which are held on school property, due to the notice against trespass.  (Docs. 48 ¶¶ 88, 142-43; 54-1 ¶¶ 88, 142-43.)

The ARSU board has approximately sixteen members, including five members who also sit on the Benson school board.  (Doc. 48-16, 6:1-7.)  The record reflects that Principal Doty and Superintendent Ryan made the Benson school board aware of both the September 2011 and the March 2012 notices against trespass after the notices had been issued.[4]  The record also indicates Superintendent Ryan did not explain to the full ARSU board how or why he issues notices against trespass, and although Superintendent Ryan warned the ARSU board that Mr. Cyr might contact them he did not explain to the full board the basis on which he issued the notices.  (Doc. 48-16, 16:22-19:5.)  On April 12, 2012, after Superintendent Ryan had issued the March 2012 notice and

---

[4] Each Benson school board member testified regarding the board's awareness of the notices against trespass.  Bobbi Bean testified that Superintendent Ryan informed the school board of both notices against trespass after issuance.  (Doc. 48-9, 31:9-35:7.)  Michael Ellis testified that Principal Doty informed him of the September 2011 notice against trespass by phone and explained that it was issued because "according to her, Mr. Cyr would on a daily basis drive up beside the office which is right next to the road, honk his horn, he was giving the finger to teachers, that sort of behavior and she felt that it was disruptive and something that the children did not need to see." (Doc. 48-6, 46:22-47:2.)  Ellis also testified that Principal Doty and Superintendent Ryan emailed him prior to issuing the March 2012 notice against trespass "based on threats reported by a – I want to say either a psychologist or a therapist."  (Doc. 48-6, 55:6-56:8.)  Jody Goodhue testified that Principal Doty and Superintendent Ryan informed the board of the September 2011 notice against trespass at the September meeting and explained that the notice was issued because Doty "felt unsafe."  (Doc. 48-10, 22:3-24:7.)  Goodhue also testified that Superintendent Ryan informed the board of the issuance of the March 2012 notice against trespass at an executive session of the board and that it was based on a letter from a "psychiatrist" that "said we feel for the safety of the schools that yes, you should" issue the notice.  (Doc. 48-10, 29:23-33:22.)  Amy Munger testified that Principal Doty informed the board of the September 2011 notice against trespass in an executive session and that the notice was issued based on "some disruption of the school premises by Mr. Cyrs [sic]."  (Doc. 48-4, 35:19-38:25.)  Munger also testified that the board was informed of the March 2012 notice against trespass at an executive session. (Doc. 48-4, 41:18-43:3.)  Thomas Neumann testified that Superintendent Ryan informed the board of the March 2012 notice against trespass at an executive session in response to a "professional opinion" that Cyr "could become a threat to us, us being the school community."  (Doc. 48-5, 31:10-32:24.)

Mr. Cyr had sought access to Dr. Cotton's letter, the ARSU sought a state court declaratory

judgment as to whether it could produce the letter.  (Docs. 48 ¶ 144; 54-1 ¶ 144.)  After

the state court dismissed the ARSU's action (Doc. 11-1), the ARSU produced Dr. Cotton's letter.

III.    Discussion

A.    Standard of Review

Under Federal Rule of Civil Procedure 56(a), a court must "grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[T]he district court must draw all factual

inferences in favor of, and take all factual assertions in the light most favorable to, the party

opposing summary judgment." Coollick v. Hughes, 699 F.3d 211, 219 (2d Cir. 2012)

(citation omitted).  The moving party "always bears the initial responsibility of informing the district

court of the basis for its motion," Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), but "[w]here

the moving party meets that burden, the opposing party must come forward with specific evidence

demonstrating the existence of a genuine dispute of material fact." FDIC v. Great Am. Ins. Co.,

607 F.3d 288, 292 (2d Cir. 2010).  "Where both parties have moved for summary judgment, 'the

court must evaluate each party's motion on its own merits, taking care in each instance to draw all

reasonable inferences against the party whose motion is under consideration.'" Murray v. Int'l Bus.

Machs. Corps., 557 F. Supp. 2d 444, 448 (D. Vt. 2008) (citing Schwabenbauer v. Bd. of Educ., 667

F.2d 305, 314 (2d Cir. 1981)).

Furthermore, "the mere existence of some alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no genuine issue of material fact." Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).  In other words, "the non-moving

party must do more than simply show that there is some metaphysical doubt as to the material facts . . . and may not rely on conclusory allegations or unsubstantiated speculation." FDIC, 607 F.3d at 292 (internal quotation marks and citations omitted). Summary judgment should therefore be granted "[w]here it is clear that no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight.'" Id.

      B.      The Cross-Motions for Summary Judgment

Mr. Cyr moves for summary judgment on both claims in his complaint. (Doc. 48.) First, he contends the ARSU violated his First Amendment right of access to information and right to free expression when it twice banned him from all ARSU property, effectively prohibiting him from attending school board meetings. Second, Mr. Cyr argues the ARSU issued the notices against trespass without notice or a meaningful opportunity to be heard, violating his Fourteenth Amendment procedural due process rights.

The ARSU moves for summary judgment on the basis that the notice against trespass did not restrict Mr. Cyr's speech based on his viewpoint and therefore did not infringe his First Amendment rights. (Doc. 49.) Additionally, the ARSU argues that as a municipality it cannot be liable under § 1983 for the actions of Superintendent Ryan because he was not a final policymaker for purposes of Monell v. Department of Social Services, 436 U.S. 658 (1978).

      1.      First Amendment Right of Access to Information

Mr. Cyr contends that he is entitled to summary judgment on the issues of whether he possessed a First Amendment right of access to Benson school board meetings and whether the ARSU infringed such a right by issuing the notices against trespass. Accordingly, the Court resolves all factual inferences in favor of the ARSU and takes all facts in the light most favorable to the ARSU in determining that no rational finder of fact could find for the ARSU.

To determine whether a First Amendment right of access to a government proceeding exists, courts apply the "experience and logic" test by considering "whether the place and process have historically been open to the press and general public" and "whether public access plays a significant positive role in the functioning of the particular process in question." Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 8 (U.S. 1986) ("Press-Enterprise II").  Although this test was developed in the context of criminal court proceedings, it has since been extended to apply to civil trials and administrative hearings.  See N.Y. Civ. Liberties Union v. N.Y.C. Transit Auth., 684 F.3d 286, 298 (2d Cir. 2011) (applying the "experience and logic" test to an administrative adjudicatory proceeding because "[o]nce unmoored from the Sixth Amendment, there is no principle that limits the First Amendment right of access to any one particular type of government process") (internal quotation marks and citation omitted); see also Cincinnati Enquirer v. Cincinnati Bd. of Educ., 249 F. Supp. 2d 911, 915 (S.D. Ohio 2003) (applying the "experience and logic" test to determine whether a right of access to school board records exists, because "[c]ontrary to Defendants' assertion that the Sixth Circuit has applied Richmond Newspapers only to adversarial proceedings of a judicial or quasi-judicial nature . . . there is no such categorical distinction") (internal citations omitted).  Thus, this Court applies the "experience and logic" test to determine whether Mr. Cyr has a right of access to Benson school board meetings.

The "experience and logic" test first requires the Court to determine whether a school board meeting is the type of proceeding that has historically been open to the general public.  The type of meeting at issue is a municipal government meeting.  Mr. Cyr contends that school board meetings and other municipal meetings in Vermont are presumptively open to the public because of longstanding state open meeting laws.  See Vt. Stat. Ann. tit. 1, § 312 (2013).  The "experience and logic" test, however, "does not look to the particular practice of any one jurisdiction, but instead to

the experience in that <u>type</u> or <u>kind</u> of hearing throughout the United States."[5]  <u>El Vocero de P.R. v. Puerto Rico</u>, 508 U.S. 147, 150 (1993) (internal citation and quotation marks omitted); <u>see also</u> <u>N.Y. Civ. Liberties Union</u>, 684 F.3d at 301; <u>Capital Cities Media, Inc. v. Chester</u>, 797 F.2d 1164, 1175 (3d Cir. 1986) (for purposes of the "experience and logic" test, "the relevant historic practice . . . is not specifically that of Pennsylvania's Department of Environmental Resources," but rather "whether the particular type of government proceeding had historically been open in our free society").

The Second Circuit's opinion in <u>New York Civil Liberties Union</u> provides guidance on identifying whether a First Amendment Right of Access exists.  It addresses the question of whether the public possesses a First Amendment right of access to an administrative adjudication to determine if an individual violated a Transit Authority Rule.  The Second Circuit first observed that such administrative proceedings did not exist at the time the First Amendment was drafted, and then considered whether analogous proceedings that did exist at that time were presumptively open to the public.  <u>See</u> <u>N.Y. Civil Liberties Union</u>, 684 F. 3d at 299.  The closest analogue to the administrative adjudicative hearing at issue was a criminal trial, and when the Transit Authority Rules were established in 1966 criminal courts made determinations under those Rules.  Because criminal trials were presumptively open to the public at the time the First Amendment was drafted, the Second Circuit found the "experience" prong satisfied for analogous administrative adjudications.  <u>Id.</u> at 300 ("the principles governing adjudication do not lose validity when the adjudication moves to another branch of government").  The Second Circuit concluded by observing that in finding a right of access

---

[5] Indeed, an approach that considers only the past practices of one jurisdiction regarding a particular type of government proceeding would lead to "gross disparities in the content of the First Amendment rights recognized" in different jurisdictions and would "act as a powerful incentive to public officials to exercise their legally permissible discretion in favor of secrecy."  <u>Capital Cities Media</u>, 797 F.2d at 1175.

to administrative adjudicative proceedings, it did not "make any broad pronouncement about the right of access to administrative processes generally."  Id.

Unlike adversarial administrative adjudications, open municipal meetings are not part of the "experience" of the United States.  Municipal meetings existed at the time the First Amendment was drafted, and at that time there was no common law right to attend government meetings.  See Soc'y of Prof'l Journalists v. Sec'y of Labor, 616 F. Supp. 569, 572 (D. Utah 1985) ("There is . . . no common-law right to attend meetings of government bodies.  Indeed, the tradition in England was to hold legislative debate in secret and to prohibit publication of legislative proceedings.") (internal citation omitted).  For this reason, the Cincinnati Enquirer court found that there was no historical basis for a right of access to school board records.  See 249 F. Supp. 2d at 915-17.  Municipal government meetings also differ from the administrative adjudications at issue in New York Civil Liberties Union because they are not analogous to the different adjudicative proceedings to which the Supreme Court has found a right of access.  See 684 F. 3d at 300 (finding a right of access to administrative proceedings because "[t]he [Transit Authority Board] and the court serve similar functions, in similar ways, and have a similar effect on the parties before them").

Because it is not the "experience" of the United States that municipal government meetings have been held presumptively open to the public,[6] the Court finds the "experience" prong of the "experience and logic" test unsatisfied.  Accordingly, there is no First Amendment right of access to a school board meeting.  The ARSU did not move for summary judgment on this issue, but because

---

[6] Mr. Cyr cites Whiteland Woods v. Township of West Whiteland, 193 F.3d 177 (3d Cir. 1999), as an example of a court finding that the public possesses a First Amendment right of access to a town planning meeting.  However, the Third Circuit later observed that its conclusion that there was a "constitutional right of access to the Planning Commission meeting" was dicta and refused to follow it.  N.J. Media Grp. v. Ashcroft, 308 F.3d 198, 214 (3d Cir. 2002).

Mr. Cyr cannot prevail on this issue as a matter of law, the Court grants summary judgment against Mr. Cyr as to his First Amendment right of access claim.  See Ramsey v. Coughlin, 94 F.3d 71, 74 (2d Cir. 1996) ("[A] district court's independent raising and granting of summary judgment in favor of the nonmoving party is an accepted method of expediting litigation.").

> 2.    First Amendment Right of Free Expression

Mr. Cyr also argues that the notices against trespass violated his First Amendment right to free expression by preventing him from physically attending school board meetings. (Doc. 48 at 19.)

The level of scrutiny applied to a First Amendment free expression claim depends on the nature of the forum.  The Second Circuit recognizes four forum categories for First Amendment purposes.  First, in a nonpublic forum -- "public property not traditionally open to public expression or intentionally designated by the government as a place for such expression" -- restrictions on speech "need only be reasonable and viewpoint neutral."  See Make the Rd. by Walking, Inc. v. Turner, 378 F.3d 133, 142 (2d Cir. 2004).  Second, in a traditional public forum -- an area traditionally held open to public expression, assembly, and debate -- the government may impose content-neutral time, place, and manner restrictions on speech so long as such restrictions are "narrowly tailored to serve a significant government interest and leave open ample alternative channels of communications."  Id. (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983)).  Third, in a designated public forum -- a place not traditionally open to assembly and debate which "the State has opened for use by the public as a place of expressive activity" -- government regulation of speech is subject to the same limitations that govern a traditional public forum.  Id. at 143.  Fourth, a limited public forum is a non-public forum which the government opens only to "certain kinds of speakers or to the discussion of certain subjects."  Id. (quoting N.Y. Magazine v. Metro. Transp. Auth., 136 F.3d 123, 128 n.2 (2d Cir. 1998)).  A limited public forum "is a subset of

the designated public forum." Id.  "In [a] limited public forum, strict scrutiny is accorded only to restrictions on speech that falls within the designated category for which the forum has been opened."[7]  Hotel Emps. & Rest. Emps. Union, Local 100 v. City of N.Y. Dep't of Parks & Rec., 311 F.3d 534, 545 (2d Cir. 2002).  Thus, the government may impose content-neutral time, place, and manner restrictions on speech within the designated category for which the forum has been opened so long as those restrictions are "narrowly tailored to serve a significant government interest and leave open ample alternative channels of communications."  Make the Rd. by Walking, 378 F.3d at 142.  For speech falling outside the designated categories in a limited public forum, "restrictions need only be viewpoint neutral and reasonable."  Hotel Emps. & Rest. Emps. Union. 311 F.3d at 546.

Viewing the facts concerning the reason for the issuance of the notices against trespass in the light most favorable to the ARSU, the Court treats the restriction on Mr. Cyr's expressive activity as content neutral.  The notices against trespass were justified by concern that Mr. Cyr posed a danger to school staff and not based on the content of his speech, which was restricted as a collateral

---

[7] There appears to be an intra-Circuit disagreement about what level of scrutiny should apply to speech within the designated category for which a limited public forum has been opened.  One panel has held that "restrictions on speech within those limits need only be reasonable and viewpoint neutral."  Gen. Media Commc'ns. v. Cohen, No. 97-6029, 1997 LEXIS 40571, at *15 n.6 (2d Cir. Nov. 21, 1997).  Five years later, the Hotel Employees panel found that speech within the designated category is subject to strict scrutiny.  See 311 F.3d at 545; see also Make the Rd. by Walking, Inc., 378 F.3d at 143 n.4 (noting but not resolving the dispute).  A more recent Second Circuit opinion suggests the Hotel Employees panel's view is correct.  See Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 346 (2d Cir. 2010) ("In a limited public forum, strict scrutiny does not apply to expressive activities outside the general purpose for which the government has opened the forum.").  This is consistent with the idea that a limited public forum is a "subset of the designated public forum," as in a designated public forum restrictions on speech are subject to strict scrutiny.  Make the Rd. by Walking, 378 F.3d at 143.  Thus, the Court applies strict scrutiny to restrictions on speech within the designated category for which a limited public forum has been opened.

consequence of the notices.[8]  See Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) ("The

principal inquiry in determining content neutrality, in speech cases generally and in time, place, or

manner cases in particular, is whether the government has adopted a regulation of speech because of

disagreement with the message it conveys.").  Therefore, restrictions on speech must be "justified

without reference to the content of the regulated speech, . . . narrowly tailored to serve a significant

governmental interest, and . . . leave open ample alternative channels for communication of the

information."  Id. at 791.

The notices against trespass issued against Mr. Cyr restrict his speech at school board

meetings, which occur on ARSU property.  School board meetings are limited public fora.[9]  See Jones

v. Bay Shore Union Free Sch. Dist., 947 F. Supp. 2d 270, 278 (E.D.N.Y. 2013) ("Typically, school

board meetings are limited public fora."); accord Hotel Emps. & Rest. Emps. Union, 311 F.3d at 545

(listing school board meetings as an example of limited public fora)  In contending that

reasonableness review should apply to the restrictions on Mr. Cyr's speech at school board meetings,

the ARSU appears to take the position that the only restricted aspects of his speech fell outside the

limited category of speech for which school board meetings were opened to the public.  However, a

categorical ban on all speech in which Mr. Cyr wished to engage undoubtedly includes speech related

---

[8] Mr. Cyr contends that the notices against trespass were not issued to protect school staff, but were issued to put a stop to Mr. Cyr's unfavorable speech about the school system.  See Huminski v. Corsones, 396 F.3d 53, 87 (2d Cir. 2004) ("A professed security concern cannot, for example, be used to mask an improper reason for closing the courtroom door, most particularly aversion to the views of the person who seeks access. Avoidance of such viewpoint discrimination is, of course, at the heart of much First Amendment protection.").  Because the ARSU disputes this and on a motion for summary judgment the Court must view factual disputes in favor of the party opposing the motion for summary judgment, the Court accepts the ARSU's given reason for the notices against trespass as true at this stage.

[9] When school board meetings are not convened, ARSU property is a non-public forum. See Pearlman v. Cooperstown Cent. Sch. Dist., No. 3:01-cv-504, 2003 U.S. Dist. LEXIS 25837, at *15 (N.D.N.Y. June 11, 2003) (a school is a non-public forum during school hours).

to school governance, the very type of speech for which school board meetings are opened to the public.  Consequently, to determine whether the ARSU violated Mr. Cyr's First Amendment right to free expression, the Court considers whether the content-neutral restrictions on Mr. Cyr's speech are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communications.  See Ward, 491 U.S. at 791.

Protecting the safety of school staff is undoubtedly a significant government interest.  See Lovern v. Edwards, 190 F.3d 648, 655-56 (4th Cir. 1999) (school officials have discretion to remove parents from school property in response to a threat of disruption).  A categorical ban of a single individual from open school board meetings, however, is not narrowly tailored and does not leave open ample alternative channels of communication.

First, a categorical ban on speech is not tailored at all, as it entirely forecloses a means of communication.  Cf. Hill v. Colo., 530 U.S. 703, 726 (2000) ("when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal").  In order to be narrowly tailored, a time, place, or manner restriction must not "burden substantially more speech than is necessary to further the government's legitimate interests."  Ward, 491 U.S. at 799. Here, ostensibly in order to protect school staff, Mr. Cyr was banned not only from the Benson school grounds, but from all premises owned by the ARSU.  He was not banned only during regular school hours, but at all hours, for two years.

Furthermore, the tailoring threshold here is even higher than in Ward, as a notice against trespass targeting an individual rather than the public generally is equivalent to an injunction against speech, and the Supreme Court has explained, "[i]njunctions . . . carry greater risks of censorship and discriminatory application than do general ordinances."  Madsen v. Women's Health Ctr., 512 U.S.

753, 764 (1994).  Consequently, "when evaluating a content-neutral injunction, . . . standard time, place, and manner analysis is not sufficiently rigorous.  We must ask instead whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest."  Id. at 765.  In the case at hand, the ARSU's categorical ban was not tailored to respond to the specific threat that Mr. Cyr potentially posed, a threat that was never articulated as anything more specific than "a potential risk of violence to [Principal Doty, Director Benway,] or their staff." (Doc. 49-1 at 3.)  If the ARSU's goal in issuing a notice against trespass to Mr. Cyr was to protect school staff, then it could have drafted a notice against trespass that was in effect only during school hours or posted a police officer at public meetings held on ARSU grounds.[10]  Also, the ARSU could have moved school board meetings to a neutral and secure location.[11]

Additionally, the Second Circuit has found that a categorical ban on expressive speech singling out an individual does not even satisfy the lower threshold of reasonableness review.  See Huminski v. Corsones, 396 F.3d 53, 92 (2d Cir. 2004).  In Huminski, the court observed that notices against trespass which barred the plaintiff from all state courthouses in Rutland due to a perceived danger "in effect prohibit[ed] indefinitely any and all expressive activity in which [plaintiff] might want to engage in and around Rutland state courthouses."  Id.  "The defendants' singling out of [plaintiff] for exclusion, thereby permitting all others to engage in similar activity in and around the courts, suggests to us that the trespass notices are not reasonable."  Id.  The ARSU imposed a similar

_____

[10] For example, Superintendent Ryan had a police officer attend the April 10, 2012 Benson school board meeting when he heard that Mr. Cyr might attend it.  (Doc. 48 ¶ 142; Doc. 54-1 ¶ 142.)

[11] For example, Principal Doty offered to meet with Mr. and Mrs. Cyr in August 2012 at the United States Courthouse in Rutland to discuss an unrelated matter.  (Doc. 53-5.)  Mr. Cyr also specifically requested that Superintendent Ryan relocate school board meetings to a location where he could attend.  Instead, Ryan told him he could attend by telephone.  (Doc. 48 ¶ 145; Doc. 54-1 ¶ 145.)

restriction on Mr. Cyr here by singling him out and categorically banning him from all Union

property.  See id. at 93-94 (when a notice against trespass was issued with "virtually no 'tailoring' at

all," the efforts of government officials to safeguard the Vermont courts "from whatever threat they

may have reasonably feared from [plaintiff] were wildly disproportionate to the perceived threat").

Second, the ARSU failed to provide Mr. Cyr with adequate alternative channels of

communication.  It is true that Mr. Cyr could have participated in school board meetings

telephonically, but this kind of participation would not have provided an adequate alternative.  As an

initial matter, the ARSU fails to consider the nature of a school board meeting.  The "intended

audience of those participating and speaking at a [school board] meeting is not isolated to district

personnel," but includes community members as well.  Teufel v. Princeton City Sch. Dist. Bd. of

Educ., No. 1:12-cv-355, 2013 U.S. Dist. LEXIS 4923, at *43 (S.D. Ohio Jan. 11, 2013).  Participating

by telephone would have substantially diminished Mr. Cyr's ability to communicate not only with the

school board, but with community members.  See Bay Area Peace Navy v. United States, 914 F.2d

1224, 1229 (9th Cir. 1990) ("[A]n alternative mode of communication may be constitutionally

inadequate if the speaker's 'ability to communicate effectively is threatened.'") (quoting Members of

City Council v. Taxpayers for Vincent, 466 U.S. 789, 812 (1984).  Furthermore, his speech may not

have had the same effect on the school board or other members in attendance at school board

meetings were he not physically present.  See City of Ladue v. Gilleo, 512 U.S. 43, 48 (1994)

("regulation of a medium inevitably affects communication itself"); Kleindienst v. Mandel, 408 U.S.

753, 765 (1972) (stating the argument that technological developments such as "tapes or telephone

hook-ups" are effective substitutes for physical presence "overlooks what may be particular qualities

inherent in sustained, face-to-face debate, discussion and questioning"); Nat'l Funeral Servs., Inc. v.

Rockefeller, 870 F.2d 136, 144 (4th Cir. 1989) (noting that "a salesman's presence over the telephone

is less persuasive than it is in person" in addressing a First Amendment claim involving commercial speech).  Additionally, since he would lack any "proximity" to the meeting, this alternative was inadequate.  See Marcavage v. City of N.Y., 689 F.3d 98, 107 (2d Cir. 2012) ("In this Circuit, an alternative channel is adequate and therefore ample if it is within 'close proximity' to the intended audience.") (citation omitted).

Furthermore, physical participation in open school board meetings is a form of local governance, and to the extent that Mr. Cyr cannot be present at these meetings to communicate directly with elected officials, his First Amendment right of free expression is violated.  The Seventh Circuit addressed the inadequacy of remote participation in political activity in the context of state curfew laws as follows:

> [T]o the extent that the curfew prevents a minor from being outside of the home during curfew hours, it does not mean simply that she must shift the exercise of her First Amendment rights to non-curfew hours or to the telephone or the internet; it means that she must surrender her right to participate in late-night activities whose context and message are tied to the late hour and public forum.  There is no internet connection, no telephone call, no television coverage that can compare to attending a political rally in person, praying in the sanctuary of one's choice side-by-side with other worshipers, feeling the energy of the crowd as a victorious political candidate announces his plans for the new administration, holding hands with other mourners at a candlelight vigil, or standing in front of the seat of state government as a legislative session winds its way into the night.

Hodgkins v. Peterson, 355 F.3d 1048, 1063 (7th Cir. 2004); see also Riley v. Nat'l Fed'n of Blind, 487 U.S. 781, 791 (1988) ("[T]he government, even with the purest of motives, may not substitute its judgment as to how best to speak for that of speakers and listeners; free and robust debate cannot thrive if directed by the government.").

In sum, the First Amendment does not permit the ARSU to confine Mr. Cyr's speech to telephone or "assistive technologies" by issuing a blanket notice against trespass when less

19

burdensome alternatives exist.  See Madsen, 512 U.S. at 765.  Accordingly, Mr. Cyr's motion for

summary judgement is granted as to his First Amendment freedom of expression claim, and the

ARSU's motion for summary judgment on that claim is denied.

3.    Fourteenth Amendment Right to Due Process

Cyr also alleges that the ARSU "stripped him of his First Amendment rights without due

process when it issued him" the notices against trespass.  (Doc. 48 at 21.)

"A procedural due process claim is composed of two elements: (1) the existence of a property

or liberty interest that was deprived and (2) deprivation of that interest without due process."  Bryant

v. N.Y. Educ. Dep't, 692 F.3d 202, 218 (2d Cir. 2012).  As discussed above, the ARSU deprived Mr.

Cyr of his First Amendment right to freedom of expression by barring him from participating in

school board meetings.

To determine whether the ARSU afforded Mr. Cyr adequate process before barring him from

school board meetings, "it is necessary to ask what process the [ARSU] provided, and whether it was

constitutionally adequate."  Rivera-Powell v. N.Y.C.  Bd. of Elections, 470 F.3d 458, 465 (2d Cir.

2006) (citation omitted).  As part of this analysis, "the Supreme Court has distinguished between

(a) claims based on established state procedures and (b) claims based on random, unauthorized acts

by state employees."  Id. (internal quotation marks and citation omitted).  A meaningful

post-deprivation remedy automatically satisfies deprivations caused by random, unauthorized acts.

Id. at 465-66.  This rule recognizes that state and local governments cannot predict when

deprivations will occur.  Id. at 465.  For deprivations based on established state procedures, a court

must balance the three factors identified in Mathews v. Eldridge, 424 U.S. 319 (1976), to determine

the process due:

First, the private interest that will be affected by the official action;
second, the risk of an erroneous deprivation of such interest through

20

> the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Id. at 335.  The Mathews test also only requires a meaningful, post-deprivation remedy.  See Nnebe v. Daus, 644 F.3d 147, 158-59 (2d Cir. 2011) (no pre-deprivation hearing necessary to suspend taxi driver following arrest), but a post-deprivation remedy is just not adequate ipso facto.  See Rivera-Powell, 470 F.3d at 465.

Mr. Cyr alleges he was deprived of due process when the ARSU issued him notices against trespass.  The notices against trespass were not issued randomly or without authority, but were decisions approved by Superintendent Ryan, the chief administrator of the school district.  Accordingly, the Court weighs the Mathews factors.

a.    Mr. Cyr's Private Interest

As previously discussed, Mr. Cyr has a strong interest in attending school boarding meetings, where he has a right to express himself.  See Berlickij v. Town of Castleton, 248 F. Supp. 2d 335, 344 (D. Vt. 2003) (stating that plaintiff "has a First Amendment right not to be excluded from a forum that is generally held open to the public"); Rowe v. Brown, 157 Vt. 373, 376 (1991) (same).

b.    The Risk of Erroneous Deprivation

The notices against trespass created a high risk of erroneous deprivation because they were not issued pursuant to any protocol, because they did not set out a process to contest the ban, and because Mr. Cyr did not receive a meaningful opportunity to contest his ban.

First, the fact that there is no protocol in place governing when an ARSU official may issue a notice against trespass increases the risk of erroneous deprivation because it grants officials broad discretion to ban members of the public from school premises and, consequently, school board

meetings.  See Shuttlesworth v. Birmingham, 394 U.S. 147, 153 (1969) ("[W]e have consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places.") (quoting Kunz v. New York, 340 U.S. 290, 293-94 (1951)).

Second, neither notice against trespass sets out any process for contesting the notice.  Cf. Catron v. City of St. Petersburg, 658 F.3d 1260, 1268-69 (11th Cir. 2011) (trespass ordinance that lacked an appeal process is procedurally inadequate).  In response to Mr. Cyr's inquiries following the March 2012 notice against trespass, the ARSU merely informed him that they might lift the notice against trespass if he underwent an independent mental health risk assessment.  (Doc. 53-6 ¶ 39.)

Third, Mr. Cyr did not receive a meaningful opportunity to contest the notices against trespass.  See Wright v. Yacovone, No. 5:12-cv-27, 2012 U.S. Dist. LEXIS 157544, at *49 (D. Vt. Nov. 2, 2012) ("The opportunity to be heard must thus occur 'at a meaningful time and in a meaningful manner.'") (quoting Mathews, 424 U.S. at 333).  Neither notice contained any explanation of the basis upon which it was issued.[12]  See Taylor v. Rodriguez, 238 F.3d 188, 193 (2d Cir. 2001) (notice must contain "specific facts underlying the allegation[s]" that led to the government's actions "because a hearing is not 'meaningful' if a [party] is given inadequate information about the basis of the charges against him.").  Cyr was informed of the basis for the March 2012 notice on April 27, 2012, when he was told by letter only that it was issued "on the basis of a written notice of risk to faculty and staff provided to the ARSU under a professional's 'duty to warn.'"  (Doc. 49-13.)  Mrs. Cyr appeared at the April 2012 Benson school board meeting and attempted to contest the notice against trespass, but received no reply from the board.  (Doc. 48 ¶¶ 139-40; Doc. 54-1 ¶¶ 139-40.) After Mr. Cyr learned that Dr. Cotton's written opinion was the basis for the March 2012 notice and

---

[12]  (Docs. 48 ¶ 128; 54-1 ¶ 128.)

sought access to that written opinion, the ARSU sought a declaratory judgment to determine whether it was required to grant Mr. Cyr access to that document.  (Docs. 48 ¶ 144; 54-1 ¶ 144.)  Mr. Cyr communicated with the Benson school and the ARSU boards through letters, but his pleas were ignored.

Because the notices against trespass were not issued pursuant to any protocol, the notices did not set out a process for contesting the notices, and Mr. Cyr had no meaningful opportunity to contest the notices, the notices posed a high risk of erroneously depriving Mr. Cyr of his First Amendment right to freedom of expression.

c.      The Government Interest

Finally, although the government undoubtedly has a significant interest in protecting the safety of school staff, that interest is not so overwhelming, taxing, or immediate that the ARSU did not have time to set out reasons for their decision and provide Mr. Cyr an opportunity to be heard. See Huminski, 396 F.3d at 87 (when a decision to bar someone from a public courthouse is made in advance, "the requirement of particularized findings obtains," as "[i]n that context, findings are a necessary safeguard against arbitrary . . . abridgement of the constitutional right").  Additionally, the ARSU could have tailored their response to concerns about Mr. Cyr in a number of non-burdensome ways, including by posting a police officer at school board meetings.  Cf. Henley v. Octorara Sch. Dist., 701 F. Supp. 545, 551 (E.D. Pa. 1988) (finding a school's interest in categorically banning two individuals from school grounds to be significant when "[i]mposing any greater procedural or administrative burdens on the defendants before banning a non-student would be fiscally and administratively burdensome").

d.      Conclusion

Upon weighing the Mathews factors, the Court finds the notices against trespass violated Mr.

Cyr's due process rights by depriving him of his First Amendment right to express his views at school

board meetings without adequate process.  The Court grants Mr. Cyr's motion for summary

judgment as to his due process claim and denies the ARSU's motion for summary judgment as to the

due process claim.

4.      Municipal Liability

The ARSU seeks summary judgment against Mr. Cyr on the grounds that even if Mr. Cyr's

First Amendment and Due Process rights were violated, the ARSU is not liable under § 1983 because

Mr. Cyr cannot establish municipal liability.

Municipalities are liable under § 1983 only if an official policy or custom causes the denial of

a constitutional right.  See Wray v. City of N.Y., 490 F.3d 189, 195 (2d Cir. 2007) (citation omitted);

see also Monell, 436 U.S. at 691.  Section 1983 liability is definitively narrower in scope than

respondeat superior; in order to prevail, "a plaintiff must demonstrate that, through its deliberate

conduct, the municipality was the 'moving force' behind the alleged injury."  Roe v. City of

Waterbury, 542 F.3d 31, 37 (2d Cir. 2008) (quoting Bd. of County Comm'rs v. Brown, 520 U.S. 397,

404 (1997)).  Thus, "recovery from a municipality is limited to acts that are, properly speaking, acts

'of the municipality' – that is, acts which the municipality has officially sanctioned or ordered."

Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986); see also Amnesty Am. v. Town of

W. Hartford, 361 F.3d 113, 125 (2d Cir. 2004) ("Demonstrating that the municipality itself caused or

is implicated in the constitutional violation is the touchstone of establishing that a municipality can be

held liable for unconstitutional actions taken by municipal employees.").

The ARSU and the Benson school do not have stated policies concerning the issuance of a notice against trespass.  (Doc. 53-6 ¶ 3.)  A plaintiff need not, however, establish an official policy or custom of a defendant municipality if the trier of fact finds that the decision in question was made by a municipal officer who has final authority to establish municipal policy.  See, e.g., Jamieson v. Poughkeepsie City Sch. Dist., 195 F. Supp. 2d 457, 474 (S.D.N.Y. 2002) (citing Pembaur, 475 U.S. at 481-82).  A single decision or course of action, even if "tailored to a particular situation and not intended to control decisions in later situations," may give rise to municipal liability if it was "properly made by that government's authorized" policymakers.  Pembaur, 475 U.S. at 481.  In this circumstance, "the inquiry focuses on whether the actions of the employee in question may be said to represent the conscious choices of the municipality itself."  Amnesty Am., 361 F.3d at 126.  Not every decision by a municipal officer triggers § 1983 liability, however.  "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."  Pembaur, 475 U.S. at 481.

Whether a particular official has final policymaking authority "is itself a legal question to be resolved by the trial judge before the case is submitted to the jury" based on state law.  Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989); Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000).  "[T]he critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit."  Roe, 542 F.3d at 37 (citing Jeffes, 208 F.3d at 57).  In that vein, policymaking authority may be delegated to other municipal employees.  Pembaur, 475 U.S. at 483.

The Benson school board is composed of five members.  Each of these members also sits on the ARSU board, which is composed of approximately sixteen members.  Principal Doty issued the

September 2011notice and Superintendent Ryan issued the March 2012 notice against trespass. Because Principal Doty informed Superintendent Ryan prior to issuing the September 2011 notice of the basis for it and Superintendent Ryan approved of its issuance, Superintendent Ryan is the relevant decisionmaker for both notices.

Initially, the Court considers whether state law vests Superintendent Ryan or the ARSU with policymaking authority regarding notices against trespass. Under Vermont law, the board of a school district "determine[s] the educational policies of the school district" and "[m]ay take any action[] which is required for the sound administration of the school district." Vt. Stat. Ann. tit. 16, § 563(1)-(2). The board has "possession, care, control and management of the property of the school district, subject to the authority vested in the electorate or any school district official" and must "keep the school buildings and grounds in good repair, suitably equipped, insured and in safe and sanitary condition at all times." Id. § 563(3)-(5). "A school board may . . . approve or disapprove rules and regulations proposed by the principal or superintendent for the conduct and management of public schools in the district." Id. § 563(1). Whereas the ARSU board is charged with making policy, the superintendent of the Union is charged with implementing board policies. See id. § 242(1) (A superintendent is "the chief executive officer for the supervisory union board and for each school board within the supervisory union" and "carr[ies] out the policies adopted by the school boards relating to the educational or business affairs of the school district or supervisory union, and develop[s] procedures to do so."). Thus, Vermont law clearly establishes school boards as final policymakers and superintendents as executors of policy.

Although he cannot argue Superintendent Ryan was vested with final policymaking authority regarding notices against trespass by state law, Mr. Cyr argues that the ARSU's authorized policymaker, the ARSU board, delegated policymaking authority to issue them to Superintendent

Ryan, a subordinate, who effectively became a final policymaker.  See Pembaur, 475 U.S. at 483

("Authority to make municipal policy . . . may be delegated by an official who possesses such

authority . . . ."); see also Soto v. Schembri, 960 F. Supp. 751, 757 (S.D.N.Y. 1997) ("The individuals

who have policymaking authority can be identified by their receipt of such authority through express

legislative grant, or through their delegation of policymaking authority from those to whom the

power has been expressly granted.").  If Superintendent Ryan merely exercised discretion, Monell

liability would not attach, but when the ARSU effectively delegates final policymaking authority to

him, Monell liability attaches.  See Christie v. Iopa, 176 F.3d 1231, 1236 (9th Cir. 1999) ("The

question therefore becomes whether the policymaker merely has delegated discretion to act, or

whether it has done more by delegating final policymaking authority.").  Benson school board

members testified that they did not believe they had the authority to overturn a notice against

trespass issued by Principal Doty or Superintendent Ryan and that Doty and Ryan retained the

authority to overturn the notices.[13]  Donald Knapp, an ARSU board member who was not on the

Benson school board, testified that he held a similar view.[14]  That ARSU board members did not

believe they had the power to contravene the notices against trespass suggests Superintendent Ryan

had final policymaking authority over the issuance of notices against trespass.  See Rookard v. Health

& Hosps. Corp., 710 F.2d 41, 46 (2d Cir. 1983) ("The reluctance of [the top official at the municipal

defendant] to intervene, or even to inquire into [plaintiff]'s claims, confirms that [a subordinate

official] had final authority in personnel matters."); cf. Hill v. N.Y.C. Bd. of Educ., 808 F. Supp. 141,

151 (E.D.N.Y. 1992) (municipal officer is not a final policymaker when "higher authorities retained

the authority to overrule [the municipal officer] on appeal").  After the March 2012 notice against

---

[13] (Doc. 48-5, 43:13-21; Doc. 48-6, 53:16-54:5.)

[14] (Doc. 48-16, 18:21-19:5.)

trespass was issued, in a letter to the Cyrs, the ARSU represented that Superintendent Ryan was "ultimately responsible for the safety and care of all students and faculty at [ARSU] facilities." (Doc. 53-4.)  On April 12, 2012, the ARSU stood by Superintendent Ryan's decisions by requesting a declaratory judgment to determine whether it needed to disclose Dr. Cotton's letter to Mr. Cyr.  See Pohl v. Green, No. 88-cv-8568, 1991 U.S. Dist. LEXIS 17889, at *10-11 (S.D.N.Y. Dec. 11, 1991) (when the decisions of a subordinate in a particular area are subject to different stages of review by the superior municipal officer and the superior municipal officer adopts the subordinate's decisions at each stage, the superior municipal officer has "effectively delegated the authority to set policy" in that area to the subordinate); Gillman v. Sch. Bd. for Holmes Cnty., 567 F. Supp. 2d 1359, 1378 (N.D. Fla. 2008) (a school board was liable under § 1983 for a superintendent's restriction on speech when it "wholesale delegated its policymaking authority" related to the speech at issue by adopting the superintendent's decision with no independent investigation).  Furthermore, Superintendent Ryan testified that the superintendent, principals, the director of special services, or anybody in administration or a leadership position would have the authority to issue a notice against trespass,[15] suggesting that in practice authority lay with the superintendent, who oversaw those officials.  See Lathrop v. Onondaga Cnty., 220 F. Supp. 2d 129, 138 (N.D.N.Y. 2002) (considering a municipal officer's admission as to the scope of his authority in testimony as evidence that a superior officer had delegated policymaking authority to the testifying subordinate).

The ARSU argues that Doe ex rel. Doe v. Dallas Independent School District, 153 F.3d 211 (5th Cir. 1998), requires a contrary result.  In Doe, plaintiffs sued a school district for acting with deliberate indifference to a former teacher's sexual abuse of students.  They sought liability under §

---

[15] (Doc. 48-3, 63:11-19.) (Those in the supervisory union who have the authority to issue a "no trespass order" include "[p]rincipals, superintendent, you know, the director of special services, anybody in, quote, administration or leadership position.").

1983 on the basis that the district delegated policymaking authority to the principal regarding the school's response to allegations of sexual abuse.  The court found the fact that a principal often "made the initial decision as to what actions to take in response" to allegations of sexual abuse was insufficient to find a delegation.  Id. at 217.  Doe can be distinguished from the case at hand.  The ARSU board did not merely grant discretion to Superintendent Ryan by instituting no policy regarding the issuance of notices against trespass.  Though no written delegation of authority occurred, Superintendent Ryan issued the notices against trespass on his own authority, and ARSU board members believed that Superintendent Ryan had that authority.  When a district school board believes that a superintendent exercised his proper authority in issuing notices against trespass, it cannot be said holding the ARSU liable for the issuance of those notices would impose respondeat superior liability.  The Court concludes Superintendent Ryan acted as a final policymaker for the ARSU when issuing the notices against trespass, and that the ARSU could be liable under § 1983 under Monell.  The ARSU's motion for summary for summary judgment on the basis of Monell is therefore denied.

IV.     Conclusion

        For the reasons discussed above, Plaintiff's motion for summary judgment (Doc. 48) is GRANTED IN PART and DENIED IN PART.  Summary judgment is granted as to Mr. Cyr's First Amendment freedom of expression claim and as to the related Fourteenth Amendment due process claim.  Summary judgment is denied as to Mr. Cyr's First Amendment right of access claim, and summary judgment is entered against Mr. Cyr on this claim.  Defendant's motion for summary judgment (Doc. 49) is DENIED.

        The Plaintiff's Amended Complaint seeks various forms of relief including declarations, injunctions, and damages.  (Doc. 22.)

On or before October 14, 2014, the Plaintiff shall submit a memorandum of not more than 10 pages on the issue of appropriate relief and damages to be considered by the court.  The Defendant's response of no more than 10 pages shall be submitted on or before October 28, 2014. No reply memoranda are necessary.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 30th day of September, 2014.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
United States District Judge

30